40

[735 NYS2d 83]

Roosevelt Islanders for Responsible Southtown Develop-ment et al., Appellants, v Roosevelt Island Operating Corporation et al., Respondents, et al., Respondents. Roosevelt Island Residents Association, Proposed Intervenor-Appellant.

Alternative Southtown Design Committee, Appellant, v Roosevelt Island Operating Corporation, Respondent.

First Department, December 18, 2001

### APPEARANCES OF COUNSEL

*Christopher DeMayo* of counsel (*Rebecca L. Franciscus* and *Marc L. Abrams* on the brief; *LeBoeuf, Lame, Greene & MacRae, L.L.P.,* attorneys), for Roosevelt Islanders for Responsible Southtown Development and others, appellants.

*Robert Chira* of counsel (*Robert Chira & Associates,* attorneys), for Alternative Southtown Design Committee, appellant.

*Stephen L. Kass* of counsel (*Jean M. McCarroll* and *Mark D. Sullivan* on the brief; *Carter, Ledyard & Milburn,* attorneys), for Roosevelt Island Operating Corporation, respondent.

*David Paget* of counsel (*Steven C. Russo* on the brief; *Sive, Paget & Riesel, P.C.,* attorneys), for The Related Companies, L.P. and another, respondents.

*Jeffrey E. Glen* of counsel (*DeForest & Duer,* attorneys), for proposed intervenor-appellant.

### OPINION OF THE COURT

NARDELLI, J.P.

In these consolidated appeals, we are asked to determine, *inter alia*, whether respondents complied with certain requirements set forth in the State Environmental Quality Review Act, and whether the proposed plan for the development of "Southtown" conformed to the General Development Plan for Roosevelt Island.

*Background*

Roosevelt Island, which was formerly known as Welfare Island (the Island), is approximately two miles long and lies in the East River between New York and Queens Counties. In December 1969, the City of New York (the City), which owns the Island, entered into a 99-year lease with the New York State Urban Development Corporation (the UDC). The Lease contemplated the construction of two residential communities on the Island as outlined in a General Development Plan (the GDP) annexed to the Lease as Schedule 2.

The GDP, a five-page document, set forth a broad program for the development of the Island in two distinct areas, a "North Town Area" (Northtown) and a "South Town Area" (Southtown), with "related Open Spaces," including "approximately six acres" which was to separate Northtown and Southtown and which was to be known as "Blackwell Park." The GDP specifically provided for approximately 5,000 units of subsidized, middle income and conventionally financed housing, 200,000 square feet of office space, 100,000 square feet of commercial space, and certain public facilities, including a school for 2,000 children, a library, community rooms, children's day care centers, swimming pools and facilities for the elderly. The GDP also contained a site plan for carrying out the overall development program, but specified that the site plan was "illustrative only and does not indicate the final form or location of the improvements." In addition, the Lease provided that the GDP could be amended upon the agreement of the UDC and the City's Mayor.

The UDC began development on the Island in 1971 and by 1977, Northtown Phase I had been completed, which included a 2,141 unit housing development, as well as that area's infrastructure and an aerial tramway. One residential complex of that phase, designated as the "Eastwood" complex, encroached on the area denominated Blackwell Park in the GDP, thereby reducing the park in size from the original "approximately six acres" to 3.86 acres, although a new three-acre park, Northtown Park, was created in a separate location on the north end of the Island.

In the mid to late 1970's, UDC's financial difficulties, compounded by other factors, brought a temporary halt to further development on the Island. In 1984, the New York State Legislature enacted the Roosevelt Island Operating Corporation Act ([the RIOC Act; L 1984, ch 899, as amended] McKinney's Uncons Laws of NY § 6385 *et seq.*), which created the

Roosevelt Island Operating Corporation (RIOC), to which UDC transferred all of its powers and obligations under the Lease. RIOC thereafter concentrated on the completion of Northtown and by 1989, Northtown Phase II, which contained 1,107 additional housing units and related public facilities, was completed. The housing of Northtown Phase II, like that of Phase I, is a mixture of market rate and publicly subsidized housing.

RIOC subsequently turned to the development of Southtown and, in conjunction therewith, retained the architectural and planning firm of Raquel Ramati Associates, which developed a proposed site plan for the entire Southtown area (the Ramati Plan). The Ramati Plan included, *inter alia*, the construction of nine predominantly residential buildings, retail and community office space, a day care center, community activity space, and various recreational facilities. However, in light of changes in public financing, market conditions, and its experiences in developing Northtown, RIOC sought various modifications to the GDP, as reflected in the Ramati Plan, including a reduction in the amount of office space and school room seats; elimination of the "Town Center" in Southtown; an increase in building height to a maximum of approximately 30 stories; and an alteration to the proportion of subsidized housing to market rate housing. In addition, in order to reflect deviations from the GDP that had already been manifested during the construction of Northtown, RIOC proposed that the GDP reflect the de facto reduction in the size of Blackwell Park from approximately six acres to approximately three acres.

RIOC, as the lead agency, with the assistance of the environmental consulting firm of Allee King Rosen & Fleming, Inc. (AKRF), prepared a 600-page final environmental impact statement (FEIS) pursuant to the State Environmental Quality Review Act ([SEQRA] ECL 8-0101 *et seq*.). RIOC determined that the FEIS was required due to the fact that the Ramati Plan differed in many respects from the GDP. On June 14, 1990, RIOC adopted a findings statement, pursuant to 6 NYCRR 617.11, which stated that the Ramati Plan was in compliance with SEQRA.

The proposed changes to the GDP, as delineated in the Ramati Plan, were thereafter submitted to the City Board of Estimate for its review and approval. On August 17, 1990, the Board of Estimate issued its approval of all but two of the proposed amendments: the increase of residential towers to "approximately 30 stories" (the Board of Estimate approved an

increase to "approximately 27 stories"); and, somewhat inexplicably, the earlier reduction of the size of Blackwell Park.

RIOC then commenced a search for a developer to carry out the Ramati Plan and, to that end, issued a "Request for Proposals." Due to poor market conditions in existence at that time, however, no bidders responded and as a result, the Ramati Plan was deferred until 1996, at which time RIOC issued a "Request for Qualifications," which did not limit bidders to the Ramati Plan, but rather allowed for "creative development" in conformity with the amended GDP. RIOC received six submissions in response to the Request for Qualifications and conditionally selected respondents The Related Companies, L.P. and The Hudson Companies Incorporated, a joint venture (to be referred to herein as Related/Hudson), to prepare a revised plan for the development of Southtown.

Related/Hudson proposed several modifications to the Ramati Plan, which included: the elimination of a 28-story tower on top of a subway tunnel, which the Metropolitan Transportation Authority would not permit when contacted by Related/Hudson's architects; construction in phases rather than one major, prolonged project; and the reduction of paved roadways with the creation of one main north-south road rather than two, as well as the construction of "drop-off areas" for vehicles at the residential structures. Related/Hudson, in formulating its plan, met frequently with RIOC, as well as RIOC's Capital Development Subcommittee, which includes numerous residents of the Island, and proposed intervenor Roosevelt Island Residents Association (RIRA).

In the interim, RIOC directed Related/Hudson to prepare an assessment comparing the potential environmental impacts of its proposed site plan with those identified in the FEIS for the Ramati Plan. Related/Hudson, purportedly at RIOC's direction, retained AKRF, the same firm engaged by RIOC to compile the 1990 FEIS, to prepare the current environmental analysis. In April 1999, AKRF submitted its assessment, which compared and reviewed potential environmental impacts on such areas as: land use, housing, population, community resources, historical and archaeological sites, visual characteristics, shadows, traffic and transportation, parking, air quality, noise, infrastructure and municipal services, contaminated materials, coastal zone management and construction impacts. The 1999 environmental assessment concluded, on the basis of this review, that the potential environmental impacts of the Related/Hudson site plan "would be comparable, if not less,

than" the Ramati Plan and "would not be expected to result in any new or substantially greater significant adverse impacts."

At a meeting convened on September 22, 1999, RIOC's Board of Directors (the Board) reviewed the 1999 environmental assessment and, upon the advice of counsel, unanimously determined that a supplemental environmental impact statement was not required,[1] as the Related/Hudson site plan would not entail any significant environmental impact not previously addressed, or inadequately addressed, in the 1990 FEIS. The RIOC Board then voted to approve the Related/Hudson site plan and authorized RIOC's President/Chief Operating Officer to negotiate a lease with Related/Hudson to carry out that plan.

## The Proceedings

Petitioner Alternative Southtown Design Committee (Alternative), an association of Island residents "concerned with the development of Southtown," commenced a CPLR article 78 proceeding on or about January 20, 2000, seeking to annul the Board's September 22, 1999 determination on the grounds that RIOC was required, pursuant to SEQRA, to prepare a supplemental environmental impact statement (EIS) for the Related/ Hudson site plan, and that the plan violated the GDP, in part because it reduced the area of Blackwell Park from approximately six acres to 3.86 acres.

Petitioner Roosevelt Islanders for Responsible Southtown Development, and certain of its members (collectively to be

---

1. The Board passed a resolution which stated, *inter alia*:
   "RESOLVED, that based upon the Southtown Project Comparison of Design/Environmental Impacts of the 1990 FEIS Project with the 1999 Modified Program, prepared by Allee, King, Rosen & Fleming, Inc., Environmental and Planning Consultants, dated: April 6, 1999 (attached hereto), RIOC finds that the modifications of the Project will not change the Project nor have the conditions changed in any way which would create a significant environmental impact not previously or inadequately addressed in the May 1990 FEIS and that no Supplemental Environmental Impact Statement or further publication, filing or circulation is necessary in connection with the changes made since the May 1990 FEIS was prepared; and be it further
   "RESOLVED, that the Revised Roosevelt Island Southtown Plan and Project are hereby approved; and be it further
   "RESOLVED, that the Related Companies, L.P. and the Hudson Companies Incorporated, (collectively, 'Developer') are hereby designated as Developer for the Southtown Project and that the Plan and Project for approximately 2000 units submitted to the Board dated April 20, 1999 be hereby approved."

referred to as RIRSD), another association of Island residents interested in the development of Southtown, filed a similar article 78 proceeding on or about January 24, 2000. RIRSD, however, proffered the additional argument that a majority of RIOC's directors had not voted for the September 22, 1999 resolution, or that there was not a quorum of qualified voters at the meeting.

Finally, proposed intervenor RIRA, which purports to be the "official representative body of the residents of Roosevelt Island," and claims as a "de facto member" every resident of the Island, moved to intervene to assert the same arguments as Alternative and RIRSD. In response, RIOC and Related/Hudson opposed the petitions as well as the motion to intervene.

The IAS court, by order and judgment (one paper) entered July 12, 2000, dismissed the article 78 proceedings. Initially, the court, apparently confusing RIRSD with RIRA, the latter of which the court made no mention by name, ruled that RIRSD's petition was untimely. The court based its ruling on the incorrect assumption that RIRSD subsequently sought to intervene on April 10, 2000, although it was actually RIRA, not RIRSD, which sought to intervene.

The court, in addressing the merits of RIRSD's petition, determined that RIOC had established that a sufficient number of Board members had approved the September 22, 1999 resolution. The court, noting that the argument consisted of a "policy dispute camouflaged as a procedural challenge," also ruled that RIOC's decision to forego the preparation of a supplemental EIS was not arbitrary or capricious since it had taken the requisite "hard look" at the relevant environmental factors and reasonably concluded that the Related/Hudson site plan did not present any new negative impacts not addressed by the 1990 FEIS.

Lastly, the court found that the claim that the Related/Hudson site plan violated the GDP lacked merit, as no changes to the amended GDP were contemplated. The court also found that the size of Blackwell Park was not affected by the Related/Hudson site plan since the prior overbuilding of Northtown had already encroached upon it.

### Discussion - Timeliness

RIOC and Related/Hudson now concede that RIRSD's petition, which was filed on January 24, 2000, or the next business day following Saturday, January 22, 2000, was timely as the

filing date was four months after the Board's September 22, 1999 determination. Moreover, the Supreme Court apparently dismissed the petition as untimely under the mistaken belief that RIRSD was the same entity as RIRA, the latter of which did not move to intervene until April 2000.

### RIRA's Motion to Intervene

■ CPLR 7802 (d) provides that the court may permit "other interested persons" to intervene in a proceeding, conferring upon the court broader authority to allow intervention in an article 78 proceeding than is permitted pursuant to CPLR 1013, which requires that a claim or defense proposed to be asserted in an action involve "a common question of law or fact" (*Ferguson v Barrios-Paoli*, 279 AD2d 396, 399; *Meringolo v Jacobson*, 256 AD2d 20, 20-21, *lv dismissed in part and denied in part* 93 NY2d 948). A proposed intervenor in an article 78 proceeding, however, must still comply with the applicable Statute of Limitations, although a proposed claim *may* be related back if the proposed intervenor's claim and that of the original petition are based on the same transaction or occurrence, and if the proposed intervenor and the original petitioner are so closely related that "the original petitioner's claim would have given the respondent notice of the proposed intervenor's specific claim so that the imposition of the additional claim would not prejudice the respondent" (*Matter of Greater N. Y. Health Care Facilities Assn. v DeBuono*, 91 NY2d 716, 721).

In this matter, RIRA filed its motion for leave to intervene three months after the expiration of the applicable Statute of Limitations. Further, despite the fact that RIRA's claims arise out of the same transaction or occurrence as the claims of Alternative and RIRSD, and that RIRA is sufficiently related to those organizations, I nevertheless conclude that the Supreme Court did not improvidently exercise its discretion when it denied leave to intervene in light of RIRA's failure to account for its lengthy delay in seeking leave and the fact that RIRA neglects to raise any arguments not already addressed by Alternative and RIRSD.

### The Board's Determination

■ RIRSD currently maintains that the Board's September 22, 1999 determination was not valid because: the Board members who voted for the resolution did not constitute a quorum; two members who voted their approval had been improperly designated as representatives of RIOC members;

and that the resolution was not approved by a majority of the Board.

There is no dispute that four individuals were present at the September 22, 1999 meeting: two members and one representative each, designated in writing, of Board members, the State Commissioner of the Division of Housing and Community Renewal (DHCR) and the State Budget Director. All four present on September 22, 1999 voted to approve the Related/Hudson site plan and the resolution declaring that a supplemental EIS was not necessary.

Section 3 (2) of the RIOC Act (Uncons Laws § 6387 [2]) provides that the Board "shall be composed of nine members," and that "[a]ny action taken by the directors of the corporation shall be taken *by majority vote of the directors then in office*" (emphasis added). RIRSD, in arguing that the Board's determination was invalid because a quorum of Board members was not present, and that a majority of the Board did not approve the resolution, relies on General Construction Law § 41, which states, in pertinent part:

> "Whenever * * * three or more persons are charged with any public duty to be performed or exercised by them jointly or as a board * * * a majority of the whole number of such persons or officers * * * at a meeting duly held * * * shall constitute a quorum and not less than a majority of the whole number may perform and exercise such power, authority or duty. For the purpose of this provision the words 'whole number' shall be construed to mean the total number which the board * * * would have were there no vacancies and were none of the persons or officers disqualified from acting."

General Construction Law § 110, however, provides that the foregoing requirement applies to every statute *"unless its general object, or the context of the language construed, or other provisions of law indicate that a different meaning or application was intended* from that required to be given by this chapter" (emphasis added).

Thus, General Construction Law § 110 permits variance from the quorum requirements of section 41 when the language or general object of a statute indicates to the contrary. In this matter, section 3 (2) of the RIOC Act (Uncons Laws § 6387 [2]) specifically provides that any action may be taken by a "majority vote of the directors then in office," evincing a clear, explicit

indication from the Legislature that a majority of the directors of the Board then in office constitutes a quorum (*see, Matter of Wolkoff v Chassin*, 89 NY2d 250). We conclude, therefore, that the unanimous vote by the four members present at the September 22, 1999 meeting, who constituted a majority of the six members then in office, was a valid action by the Board.

RIRSD further maintains that because the Commissioner of the DHCR and the State Budget Director each designated more than one representative to the Board,[2] these designations were improper and, therefore, there was no quorum and no majority vote in favor of the resolution. I disagree.

Section 3 (4) of the RIOC Act (Uncons Laws § 6387 [4]) provides that:

> "The commissioner and the director of the budget may each designate an officer or employee of his respective division to represent such member at meetings of the corporation. Such designation shall be by written notice filed with the chairman or the secretary of the corporation by the member making the designation, and may be revoked at any time by similar notice. *Any representative so designated* shall have the power to attend and to vote at any meeting of the corporation from which the member making the designation is absent with the same force and effect as if the member making the designation were present and voting." (emphasis added.)

I discern nothing in the above to support RIRSD's overly rigid reading of the statute that each department is limited to one designee. Indeed, the language "[a]ny representative so designated" appears to give the Commissioner and the Director of the Budget latitude in appointing more than one designee. As a result of all of the foregoing, I conclude that the vote of the Board on September 22, 1999 was valid.

*SEQRA Requirements*

RIRSD and Alternative both contend that RIOC failed to comply with SEQRA by approving the September 22, 1999 resolution without ordering a supplemental EIS.

SEQRA was enacted in 1975 and became effective on September 1, 1976 (L 1975, ch 612, § 2, as amended by L 1976,

---

2. The Commissioner of the DHCR, by letter dated April 20, 1999, designated three representatives to the Board, and the State Budget Director, by letter dated September 18, 1998, designated five representatives.

ch 228, § 4). Its stated purpose is "to declare a state policy which will encourage productive and enjoyable harmony between man and his environment [and] to promote efforts which will prevent or eliminate damage to the environment and enhance human and community resources" (ECL 8-0101). In addition, unlike its Federal counterpart and model, the National Environmental Policy Act ([NEPA] 42 USC § 4321 *et seq.*), SEQRA does not merely require disclosure, but rather " 'imposes far more "action-forcing" or "substantive" requirements on state and local decision makers than NEPA imposes on their federal counterparts' " (*Matter of Jackson v New York State Urban Dev. Corp.*, 67 NY2d 400, 415, quoting Gitlen, *The Substantive Impact of SEQRA*, 46 Alb L Rev 1241, 1248).

An essential function of SEQRA is to incorporate environmental considerations directly into the governmental decision-making process as early as possible when it is still practical to modify the proposed project in order to mitigate adverse environmental effects (*Matter of Coca-Cola Bottling Co. v Board of Estimate of City of N. Y.*, 72 NY2d 674, 679; *Matter of Billerbeck v Brady*, 224 AD2d 937; *Matter of WEOK Broadcasting Corp. v Planning Bd. of Town of Lloyd*, 165 AD2d 578, 580-581, *affd* 79 NY2d 373). The actions which fall within the purview of SEQRA include "projects or physical activities, such as construction or other activities that may affect the environment by changing the use, appearance or condition of any natural resource or structure, that * * * are directly undertaken by an agency; or * * * involve funding by an agency; or * * * require one or more new or modified approvals from an agency or agencies" (6 NYCRR 617.2 [b] [1] [i]-[iii]).

The "heart" of SEQRA (*Jackson v New York State Urban Dev. Corp.*, *supra*, at 415) and the primary mechanism by which it ensures the environmental integrity of any such actions which "may have a significant effect on the environment" is the preparation of an environmental impact statement (ECL 8-0109 [2]).[3] Further, social, economic and environmental factors are all to be considered in reaching decisions on proposed activities (ECL 8-0103 [7]). The EIS, which is to be prepared by either the entity seeking agency approval or the agency itself, must contain, *inter alia*, a description of the proposed action and its environmental setting; the short and long-term

---

3. The purpose of an EIS is to act as an "environmental 'alarm bell' " in order to alert public officials to environmental shifts before those changes reach "ecological points of no return" (*Matter of Town of Henrietta v Department of Envtl. Conservation of State of N. Y.*, 76 AD2d 215, 220).

environmental impact of the proposed action; adverse environmental effects which would be unavoidable should the proposed plan be implemented; alternatives to the proposed action; and proposed mitigation measures to minimize environmental impact (ECL 8-0109 [2]).[4]

Initially, the entity or agency must prepare a draft EIS in order to inform the public and other public agencies as early as possible about proposed actions which may significantly affect the quality of the environment, as well as to solicit comments which will assist the agency in the decision-making process. In furtherance thereof, the agency shall determine whether or not to conduct a public hearing on the environmental impact of the proposed action (ECL 8-0109 [4], [5]). Finally, an action which is the subject of an EIS can only be carried out once an explicit finding has been made by the agency that the requirements of SEQRA have been met and that consistent with the social, economic and other relevant essential considerations, adverse environmental impacts which are revealed in the EIS will be minimized or avoided (ECL 8-0109 [8]).

The SEQRA regulations also provide that the "lead agency *may require* a supplemental EIS, *limited to the specific significant adverse environmental impacts* not addressed or inadequately addressed in the EIS that arise from * * * *changes proposed for the project* * * * newly discovered information; or * * * a change in circumstances related to the project" (6 NYCRR 617.9 [a] [7] [i] [a]-[c] [emphasis added]).

RIRSD maintains, however, that the aforecited regulation is inapplicable because it was not adopted until 1995 and did not become effective until January 1, 1996, and that the Related/Hudson proposal, which was adopted in 1999, somehow relates back to the 1990 Ramati Plan, thereby falling under the scope of the former regulations. I disagree and find that the Related/Hudson proposal falls under the regulations that were in effect when it was drafted.

In any event, if I were to find RIRSD's argument persuasive, the result would be no different. The regulations concerning supplemental EIS's, which were in effect before the 1995

4. An EIS provides a means for agencies, project sponsors and the public to systematically consider significant adverse environmental impacts, alternatives and mitigation. An EIS facilitates the weighing of social, economic and environmental factors early in the planning and decision-making process. A draft EIS is the initial statement prepared by either the project sponsor or the lead agency and is circulated for review and comment. (6 NYCRR 617.2 [n].)

amendments and to which RIRSD refers, provided, in pertinent part, that: *"[p]rior to the filing of a findings statement*, the lead agency may require a supplemental EIS, limited to specific issues not addressed or inadequately addressed in the EIS," if "changes are proposed for the project which may result in a significant adverse environmental effect" (6 NYCRR 617.8 [g] [1] [i] [1987 amendments] [emphasis added]).

In view of the foregoing, RIRSD insists that a supplemental EIS may only be prepared if a findings statement has not yet been filed, and since an EIS and findings statement were filed in 1990 in connection with the Ramati Plan, a supplemental EIS is simply not an option and an entirely new EIS is required to address the modifications to the Ramati Plan embodied in the Related/Hudson site plan. I disagree.

In *Lazard Realty v New York State Urban Dev. Corp.* (142 Misc 2d 463), the holding of which RIRSD now urges us to reject, the court noted that 6 NYCRR 617.3 (k) (2), which took effect in 1987 but was repealed in 1995, provided that " '[a]ctions commonly consist of a set of activities or steps (*e.g.,* for capital projects the activities may include planning, design, contracting, demolition, construction and operation)' " and that " '[t]he entire set of activities or steps shall be considered the action,' " and " 'only one draft and one final EIS need be prepared on the action if the statement addresses each part of the action at a level of detail sufficient for an adequate analysis of environmental effects' " and that a supplemental EIS " 'will only be required in the circumstances prescribed in section 617.8 (g) of this Part' " (*Lazard Realty v New York State Urban Dev. Corp., supra,* at 471).

The court in *Lazard* flatly rejected the identical argument proffered by RIRSD and went on to conclude that the site plan which was the subject of that action, involving a partial change in the use of one site that was an integral part of a larger project involving 12 sites, was "simply a later step in implementing the Project" (*Lazard Realty v New York State Urban Dev. Corp., supra,* at 471) and, therefore, was only subject to a possible supplemental EIS, but did not constitute a new "action" requiring a new EIS. Indeed, as the Court of Appeals opined in *Matter of Jackson v New York State Urban Dev. Corp.* (*supra,* at 417), "an agency's substantive obligations under SEQRA must be viewed in light of a rule of reason" (*accord, Matter of Neville v Koch,* 79 NY2d 416; *Akpan v Koch,* 75 NY2d 561). It is my view that it would simply not be reasonable to conclude that the Legislature intended for the mere filing of a final EIS

and findings statement to serve to preclude the preparation of a supplemental EIS when such a limited review is warranted.[5] Accordingly, I adopt the reasoning of the *Lazard* court.

RIRSD, in the alternative, argues that RIOC was required to prepare a supplemental EIS because of the potential adverse impacts on the environment posed by the Related/Hudson site plan that did not arise in the Ramati Plan, and, further, that RIOC failed to take the required "hard look" at the potential impacts. Petitioner Alternative's arguments echo those of RIRSD.

SEQRA does not contain a provision addressing the topic of judicial review; therefore, the courts must adhere to the standards generally applicable to administrative proceedings: an agency's declaration must be sustained unless the court concludes that it " 'was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion' " (*Matter of Jackson v New York State Urban Dev. Corp.*, *supra*, at 416, quoting CPLR 7803 [3]; *see also, Chinese Staff & Workers Assn. v City of New York*, 68 NY2d 359, 363; *Matter of City of Schenectady v Flacke*, 100 AD2d 349, 353, *lv denied* 63 NY2d 603). Under the foregoing standard, "it is not the role of the court to weigh the desirability of the proposed action, choose among alternatives, resolve disagreements among experts, or substitute its judgment for that of the agency" (*Matter of Fisher v Giuliani*, 280 AD2d 13, 19-20; *see also, Matter of Neville v Koch*, *supra*, at 424-425). Rather, court review is limited to whether the lead agency identified " 'the relevant areas of environmental concern,' " took a " 'hard look' " at them, and "set forth a reasoned elaboration for its determination" (*Matter of Merson v McNally*, 90 NY2d 742, 751, quoting *Matter of Chemical Specialties Mfrs. Assn. v Jorling*, 85 NY2d 382, 397; *see also, Matter of WEOK Broadcasting Corp. v Planning Bd.*, *supra*, at 381; *Matter of Coca-Cola Bottling Co. v Board of Estimate*, *supra*, at 680).

Petitioners first assert that the Related/Hudson site plan reduces the size of Blackwell Park by more than a third, from approximately six acres to 3.86 acres, although they fail to ac-

---

**5.** The Federal courts, in interpreting the National Environmental Policy Act (42 USC § 4321 *et seq.*), the paradigm for SEQRA (*see*, Orloff, *SEQRA: New York's Reformation of NEPA,* 46 Alb L Rev 1128 [1982]), have also held that an agency need not ignore a prior, comprehensive environmental review and begin the process anew in order to reassess the impacts of a project change, even though the changes occurred many years after the preparation of the original EIS (*Village of Grand View v Skinner*, 947 F2d 651 [2nd Cir 1991]; *Hughes Riv. Watershed Conservancy v Glickman*, 81 F3d 437).

knowledge that the park was actually encroached upon by prior development in connection with Northtown. Further, the Related/Hudson site plan increases the total amount of open space from 8.2 acres to 15.1 acres, with 5.4 acres of open space between Northtown and Southtown, which is "approximately six acres," and although this space is not contiguous, it is not unreasonable to conclude that the proposed layout is not significant as the separating line is a road, not a building. Nor is it unreasonable to conclude that the movement of soccer and softball fields, as well as a children's play area, to the south is insignificant, especially in light of the fact that the Ramati Plan had actually eliminated the soccer fields. Since "challenges to the conclusions drawn [by the lead agency] from the data presented requiring * * * a substitution of judgment [by the court] will likely fail" (*Akpan v Koch, supra,* at 571), and since differing conclusions reached by other experts concerning the potential adverse environmental impacts are insufficient to annul an agency's determination (*Matter of Orchards Assocs. v Planning Bd. of Town of N. Salem,* 114 AD2d 850, 852, *appeal dismissed* 68 NY2d 808), I find the petitioners' assertions with regard to the "reduction" of open space to be without merit.

I also find without merit petitioners' assertion that the 1999 AKRF environmental assessment failed to adequately evaluate the impact of shadows cast by buildings in the Related/Hudson site plan over the historic Blackwell House. The two northernmost buildings in the Related/Hudson site plan will be 100 feet closer to Blackwell House; however, one will be five stories shorter than its Ramati Plan counterpart and the other will be between nine and two stories shorter than the comparable Ramati Plan building. Thus, shadows would fall north at roughly the same time under both plans and it was not arbitrary and capricious for RIOC to determine that "[s]hadows from the proposed modified program would not be significantly different from those analyzed in the 1990 FEIS."

Alternative also complains that the northernmost building of Southtown will block views from Northtown of the Queensboro Bridge, but photographs disclose that the current view of the bridge from Northtown is extremely limited due to the canyon-like effect of Northtown's close buildings. Moreover, under the Ramati Plan, views of the bridge would have been blocked by the creation of Southtown buildings, with views existing only down the two main streets.

RIRSD further claims that the Ramati Plan laid out Southtown in a grid pattern to effect a small-town character, along

with a Town Square, which would be significantly affected by the Related/Hudson layout. The current plan, however, does provide for a "Town Square," although it is not strictly square and, in any event, the determination of whether a change is significant depends upon its impact on the "*existing* community or neighborhood character" (6 NYCRR 617.7 [c] [1] [v] [emphasis added]).

RIRSD next complains that the Related/Hudson site plan will reduce the retail and commercial space allotted in the Ramati Plan from 29,100 gross square feet to 15,000 gross square feet. These numbers, coupled with RIRSD's dissatisfaction with them, are insufficient to render RIOC's determination of non-significance arbitrary and capricious, particularly since under both the Ramati Plan and Related/Hudson site plan, retail space accounts for less than 2% of the total gross square footage.

RIRSD also avers that the 1999 AKRF environmental assessment neglected to study the effects of air pollutants, other than carbon monoxide emission, and should have looked to other pollutants, including lead pollutants from lead paint on the elevated bridges, pollutants from an expanded KeySpan power plant located across the East River, and pollution from increased traffic on the Queensboro Bridge. AKRF, however, did consider pollutants other than carbon monoxide, and concluded that the levels had not significantly changed from those studied under the 1990 final EIS, including the KeySpan plant, formerly known as Ravenswood. A study of lead paint removal from bridges was not performed as the City Department of Transportation had already prepared an EIS on lead paint removal from neighboring bridges. Lastly, the 1990 final EIS had overestimated the vehicular traffic crossing over the Queensboro Bridge, and the resulting emissions, by 60%, which more than compensated for the purported 28% increase in traffic from 1990 to 1999. A new study, therefore, was unnecessary.

The 1999 AKRF environmental assessment also stated that "changes may have occurred in the baseline traffic conditions *since 1990 that could affect the operational capacities of the lo-*cal street network" and the "addition of the project-generated trips to these corridors could now have adverse effects not originally disclosed," although the "overall characteristics of traffic conditions in the study area is probably similar to that identified in the 1990 FEIS." RIRSD latches onto AKRF's use of the word "probably" and opines that such uncertainty reflects the need for a supplemental EIS. That determination, however,

was based on a study of traffic volume conducted in 1998 and, consequently, was reasonably based. I also find that the mere use of the word "probably" does not necessitate the preparation of a supplemental EIS.

Finally, I conclude that all of petitioners' remaining complaints concerning RIOC's decision not to prepare a supplemental EIS, like those that were specifically discussed above, merely reflect different conclusions drawn from the data, and impermissibly ask the court to substitute its judgment for that of the lead agency. In view of all of the foregoing, I conclude that RIOC's preparation and review of the environmental assessment prepared in connection with Related/Hudson's challenged site plan clearly demonstrates that it took the requisite "hard look" at the potential impacts of that plan and, further, that it was not arbitrary and capricious for it to determine that a supplemental EIS was not warranted.

*The GDP Requirements*

■ The petitioners contend that the Related/Hudson site plan violates the GDP, as amended in 1990, because it reduces the size of Blackwell Park from "approximately six acres" to 3.86 acres. RIRSD also asserts that the Supreme Court improperly applied the "arbitrary and capricious" standard in reviewing RIOC's determination since the GDP is a contract, in that it is incorporated into the lease between the City and RIOC.

RIRSD, however, "[a]s a third party seeking to enforce a contract * * * had to establish that [it] was an intended beneficiary of the contract rather than merely an incidental beneficiary" (*Cole v Metropolitan Life Ins. Co.*, 273 AD2d 832, 833; *DiSano v KBH Constr. Co.*, 280 AD2d 951, 953). Moreover, in cases where claimant is not a party to the contract at issue, but claims third-party rights therefrom, New York has adopted the standard set forth in the Restatement (Second) of Contracts (*LaSalle Natl. Bank v Ernst & Young*, 285 AD2d 101, 108), to wit, "[o]ne is an intended beneficiary if one's right to performance is 'appropriate to effectuate the intention of the parties' to the contract *and* either the performance will satisfy a money debt obligation of the promisee to the beneficiary or 'the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance'" (*Lake Placid Club Attached Lodges v Elizabethtown Bldrs.*, 131 AD2d 159, 161 [emphasis in original], quoting Restatement [Second] of Contracts § 302 [1] [b]; *see also, Fourth Ocean Putnam Corp. v Interstate Wrecking Co.*, 66 NY2d 38; *LaSalle Natl. Bank v*

*Ernst & Young, supra,* at 108). An incidental beneficiary is a third party that may derive a benefit from the performance of a contract though that party is neither the promisee nor the one to whom performance is to be rendered (*Cole v Metropolitan Life Ins. Co., supra,* at 833; *Artwear, Inc. v Hughes,* 202 AD2d 76, 81).

There is no dispute that RIRSD is not a party to the GDP and, in my view, it lacks standing to challenge any breach of that plan as it is merely an incidental, rather than intended beneficiary, of its provisions.

RIRSD additionally argues that RIOC's prior attempt in 1990 to amend the GDP and reduce Blackwell Park from "approximately six acres" to "approximately three acres" is inconsistent with RIOC's current position and, therefore, should not be accorded deference. I reject this argument, however, for as RIOC notes, it merely sought to amend the GDP to formally recognize an encroachment that had already been effected by the construction of Northtown, and could not occur as a consequence of the approved Related/Hudson site plan. It is unclear why that amendment was rejected by the Board of Estimate, as no explanation was provided at that time.

Petitioners further maintain, without any discernible support in the record, that the maps attached to the original GDP demarcating Blackwell Park are not legally binding and that the park can be reshaped and repositioned anywhere, so long as it consists of six contiguous acres, separates Northtown and Southtown, and contains Blackwell House, a landmark 18th century farmhouse. Petitioners' own strict reading of the GDP, however, provides no authority to reposition Blackwell Park so that it encroaches upon Southtown. Moreover, even under the proposed Related/Hudson site plan, the area across a main road will increase the open space between Northtown and Southtown to 5.4 acres, and although it will not be contiguous because the roadway will separate 3.86 acres from the remaining 1.54 acres, it remains "approximately six acres." In view of the prior encroachment of the Northtown development on the acreage set aside for Blackwell Park, I conclude that RIOC's decision not to interpret the GDP as mandating compensatory acreage from Southtown was not arbitrary and capricious.

Finally, I find no support in the record for petitioners' claims that the Hudson/Related site plan does not conform to the GDP requirements concerning the allocation of subsidized housing and accommodations for families with children.

Accordingly, the order and judgment (one paper) of the Supreme Court, New York County (Harold Tompkins, J.),

entered July 12, 2000, which, in two proceedings consolidated for disposition seeking to annul the determination of respondent RIOC approving respondent Related/Hudson's site plan for an area of Roosevelt Island known as Southtown, *sua sponte* dismissed as untimely petitioner RIRSD's petition, denied and dismissed the petition of Alternative, and denied the motion of RIRA to intervene, should be modified, on the law, to vacate so much of the judgment that dismissed RIRSD's petition as untimely and, instead, to deny and dismiss that petition on the merits, and otherwise affirmed, without costs.

Motion seeking a preliminary injunction denied.

Tom, Mazzarelli, Rubin and Marlow, JJ., concur.

Order and judgment (one paper), Supreme Court, New York County, entered July 12, 2000, modified, on the law, to vacate so much of the judgment that dismissed Roosevelt Islanders for Responsible Southtown Development's petition as untimely and, instead, to deny and dismiss that petition on the merits, and otherwise affirmed, without costs. Motion seeking a preliminary injunction denied.