Friends of Fort Greene Park v New York City Parks & Recreation Dept. (2025 NY Slip Op 25151)

[*1]

Friends of Fort Greene Park v New York City Parks & Recreation Dept.

2025 NY Slip Op 25151

Decided on July 1, 2025

Supreme Court, New York County

Chesler, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on July 1, 2025
Supreme Court, New York County

Friends of Fort Greene Park, Petitioner,

against
New York City Parks and Recreation Department, John Does, ABC Corporations, Respondent.

Index No. 159628/2023

Counsel for Petitioner:
Underberg & Kessler LLP 
300 Bausch & Lomb Place 
Rochester, NY 14604
By: Jacob H. Zoghlin, Esq., Mindy L. Zoghlin, Esq. 
Counsel for Respondent (New York City Parks and Recreation):
New York City Law Department
100 Church Street
New York, NY 10007
By: Nathan Taylor, Esq., Andrew Rauchberg, Esq.

Ariel D. Chesler, J.

"Brooklyn was a dream. All the things that happened there just couldn't happen. It was all dream stuff. Or was it all real and true and was it that she, Francie, was the dreamer?"
"There's a tree that grows in Brooklyn. Some people call it the Tree of Heaven. No matter where its seed falls, it makes a tree which struggles to reach the sky. It grows in boarded-up lots and out of neglected rubbish heaps. It grows up out of cellar gratings. It is the only tree that grows out of cement. It grows lushly . . . survives without sun, water, and seemingly without earth. It would be considered beautiful except that there are too many of it."
(Betty Smith, A Tree Grows in Brooklyn [1943]).
[*2]BACKGROUND
There are many reasons to be passionate about Fort Greene Park. It contains multitudes — our past, our present, our hearts, our dreams, Brooklyn, America. Its history reaches back to the founding of our beloved country, tangibly connecting us to the Revolutionary War and the War of 1812, and from there to the most renowned architects and planners in our nation's history.
Within the park is the site of Fort Putnam which was built in 1776 by General Nathaniel Greene. Although intended to impede the British troops from Long Island, it was abandoned later that year and leveled by the British. The site was used again as a fortification in the War of 1812, and in 1814 was transformed into a large star-shaped fortification called Fort Greene in honor of General Greene. 
In 1845, following efforts by the famed poet and essayist Walt Whitman, it was the first piece of land to be designated for use as a park in what was then called the City of Brooklyn, and its first name was Washington Park. It would not be called Fort Greene Park until 1897.
In 1867, the Park was redesigned by the iconic landscape architecture firm of Frederick Law Olmsted and Calvert Vaux ("Olmsted & Vaux"), who designed both Central Park in Manhattan and Prospect Park in Brooklyn. Fort Greene Park was separated by Olmsted & Vaux into two distinct sections: the "Pleasure Ground," a picturesque pleasure ground; and the "Parade Ground" (or "Plaza"), an open area for public meetings designed to accommodate public gatherings of up to 30,000 people.
An integral part of the new design was the creation of a crypt within the Park to house the remains of some of the 11,000 patriots (Prison Ship Martyrs') who had perished on over-crowded British prison ships anchored for six years in Brooklyn's Wallabout Bay during the Revolutionary War. The number of those patriots, including slaves fulfilling their masters' military obligations, who were captured in the Battle of Long Island and capture of New York and cruelly held by the British in floating death sentences may have in fact reached 20,000 (Complaint Ex. A Owens Report at 2, 24 [NYSCEF DOC 4]).
The monument to the Prison Ship Martyrs' Memorial is a single Doric column standing 149 feet in height sitting over the crypt. This was designed and constructed by the nationally famous firm of McKim, Mead & White in 1905, and a dedication ceremony was held in 1908.
Over the years, many upgrades and redesigns took place, including efforts led by Robert Moses and Gilmore D. Clark in the 1930s and the landscape architect A.E. Bye in the 1970s. Notably, two large earthen granite block mounds (now referred to as the "Bye Mounds") were built in the center of the linear portion of the lower plaza, a circular garden area was included in the circular portion of the plaza, and tightly spaced Norway Maples were planted along the perimeter of the Northwest corner.
In 1978, the Landmarks Preservation Commission designated the park and the area around it as Fort Greene Historic District.
In the 1990s, improvements were made to basketball and tennis courts in the Park, partially funded by a local resident, the preeminent filmmaker and Knicks' fan Spike Lee (see Owens Report at 24 [NYSCEF DOC 4]). In 2008, one hundred years after its original dedication, the Prison Ship Martyrs Monument was unveiled after a full restoration (see Resps Ex 2 Environmental Impact Statement at attachment A, A-4 [NYSCEF DOC 40]). "The celebration included a Revolutionary War re-enactment, a Walt Whitman impersonator, a re-lighting of the [*3]urn on top of the monument and the return of the bronze eagles to the monument site, providing a fitting recap of the park's history" (see Owens Report at 25 [NYSCEF DOC 4]).
Today, the Park is a cherished community resource, hosting events, and allowing Brooklynites (and all who visit) to connect to nature, honor the Prison Ship Martyrs, to gather, reflect, stroll or play.
And, while community members and the parties to this proceeding may have differing views about what is best for the Park's future, there is no doubt that a deep care and concern for the Park's future are shared by all.
It is critical to note here that while the history and meaning of Fort Greene Park are sweeping and grand, the initial task before this Court is primarily a narrow one, prescribed by the applicable environmental review laws. This Court does not sit as policy maker, expert, or in judgment on how best to improve, modernize or preserve the Park. 
At the same time, in New York — from Walt Whitman to Betty Smith to Spike Lee - we dream big, and we are resilient, we strive, and we lead the way. And in that same tradition, this case also involves a consideration of the dreams for our future held by our state legislators as they proposed and voted on the Green Amendment to our State Constitution. And so, this Court must also consider what rights are guaranteed by the Green Amendment, how to apply the Amendment, and how, if at all, it is implicated by the proposed project in this case.
THIS PROJECT
The origins of the proposed project at issue in this case began in 2015 when the Parks Department launched its Parks Without Borders program, which had three primary objectives: (1) to make parks more accessible and welcoming to everyone; (2) to improve neighborhoods by extending the beauty of parks out into communities; and (3) to create vibrant public spaces by transforming underused areas. (see Aff of Christopher Syrett in Support of Answer at 5 [NSYCEF DOC 34]). Following a citywide survey which requested input from residents, Fort Greene Park was one of a select group of parks selected for redesign.
In 2017, Parks sought to perform the Lower Plaza and sidewalk improvements separately from the rest of the current expanded Project. However, in 2019, Supreme Court vacated the Parks Department's determination that the Lower Plaza Project was a Type II SEQRA action, exempt from environmental review. The court did not rule that the Project had been ineligible for Type II status but ruled that the Parks Department's Type II determination had been insufficiently supported (see Sierra Club, et al. v. Dep't of Parks and Recreation, et al., 2019 NY Slip. Op. 33812(U) at 13 [NY Cty. Sup. Ct. 2019]["The court does not conclude that the Type II designation was improper."]). The court thus remanded the determination to Parks for additional consideration.
Rather than visiting the Lower Plaza project on its own, Parks considered an expanded project which would cover more than 10 acres of the Park. Because the combined Project meets Type I thresholds, Parks designated the Project as Type I and conducted a full environmental assessment.
The Project involves the renovation of the northwest corner of Fort Greene Park ("the Park") that would, among other things, remove at least 78 mature trees and eliminate a set of grassy "mounds" with granite-block edges which were designed by architect A.E. Bye (the "Bye mounds"), to be replaced with a new corner entry staircase and two additional entry ramps over [*4]the 13 acre area. The Project also included improvements to the Myrtle Avenue Landscape and southeast park path; improvements to Willoughby Street and St. Edwards Street entrances and DeKalb Avenue Stairs; and improvements to the West Park landscape (see Resps Ex 2 Environmental Impact Statement at Attachment A, A-1 [NYSCEF DOC 40]).
COMMUNITY INPUT
Following extensive outreach to the community, and after public input meetings were held in 2016 and 2017, Brooklyn's Community Board 2 voted to recommend approval of the proposal and issue a formal letter in support on September 14, 2017 (NYSCEF DOC 54).
Further, because the Park is in a designated Historic District, the Landmarks Preservation Commission (LPC) was required to review certain aspects of the proposed project. On September 12, 2016, after a public hearing held on September 6, 2016, LPC approved and issued a Binding Report for the entrance, stair, wall, and pathway modifications, drainage infrastructure improvements, construction of an access ramp, and all components of the Phased Work (seeEAS at Appx A [NYSCEF DOC 40]). LPC issued an amendment to this approval on May 18, 2018, approving an expanded scope of work for these components of the Project, which was revised to include replacement of pavers, installation of decorative fencing, installation of benches, and change of material of cheek walls.
With respect to the proposed Parks Without Borders aspects of the Project, on September 19, 2017, a public hearing was held at LPC addressing these components, including the modification of entrances and installation of furnishings in the northwest section of the Park and a portion of the adjoining sidewalk. LPC scheduled a second hearing for November 2017. On November 21, 2017, the Parks Department presented revised designs making multiple modifications to address the concerns that had been raised at the September meeting. LPC voted to approve the modified PWB proposal on November 21, 2017, and issued a Binding Report on November 26, 2018 after in-depth reviews of the final Project drawings (Id.). Finally, on June 22, 2021, LPC heard and approved the Parks presentation to improve accessibility and combat soil erosion in the West Park Landscape project area and on July 14, 2021, LPC later issued a Binding positive Report to the Parks Department.
THIS PROCEEDING
Petitioner, Friends of Fort Greene Park, commenced this Article 78 proceeding due to the plans of respondent, New York City Department of Parks and Recreation ("Parks Department" or "Parks") to renovate and re-design the northwest corner of Fort Greene Park. Petitioner challenges the environmental review process undertaken by respondents for the Fort Greene Park "Entrances, Paths, Plaza and Infrastructure Reconstruction" project (the "Project") pursuant to the State Environmental Quality Review Act (SEQRA) and the City Environmental Quality Review (CEQR) (Mayoral Executive Order #91, as amended by Title 62, §§ 5-01, et seq, of the Rules of the City of New York), arguing that the Parks Department, inter alia, failed to take a "hard look" at all potentially significant adverse environmental impacts that may result from the Project.
While respondents argue that the Project will make the Park more accessible to people with disabilities, address erosion and drainage issues, improve safety, and rehabilitate damaged and deteriorating paths in the Park, and honor the original intent of the Lower Plaza, petitioner claims that the Project will result in over 3,000 square inches of lost trunk space from the [*5]removal of mature trees, reduce the amount of active and open space and alter the Park's historic landscape.
THE REVIEW PROCESS
In 1975, the New York State Legislature enacted SEQRA to incorporate environmental considerations into the decision-making processes of state, regional and local government agencies at the earliest possible opportunity (see Matter of Neville v Koch, 79 NY2d 416, 426 [1992]; see ECL § 8-0109[4]; 6 NYCRR 617.1 [c]). CEQR is the means by which SEQRA is implemented in the City of New York. To accomplish this goal, "SEQR[A] requires that all agencies determine whether the actions they directly undertake, fund or approve may have a significant impact on the environment, and, if it is determined that the action may have a significant adverse impact, prepare or request an environmental impact statement (EIS)" (6 NYCRR 617.1 [c]).
SEQRA requires that a single entity assume lead agency status (see 6 NYCRR 617.6 [b]). The lead agency then designates the action as either Type I, Type II, or Unlisted (see 6 NYCRR 617.4; 617.5).
"A [T]ype I action carries the presumption that it is likely to have a significant adverse impact on the environment and may require an environmental impact study. Type II actions are not subject to environmental impact review because these actions have been determined not to have a significant adverse impact on the environment. Unlisted actions must undergo an environmental impact study to determine if the action may have a significant adverse impact on the environment"
(Matter of 475 Ninth Ave. Assoc. LLC v Bloomberg, 2 Misc 3d 597, 600-601 [Sup Ct, NY County 2003] [internal citation omitted]).
If an action is designated as a Type I or Unlisted action, as is the case here, then the lead agency must prepare an Environmental Assessment Form ("EAF"), to determine the significance of the environmental impact (6 NYCRR 617.6 [a][2], [3]). The criteria for determining significance includes, among others, any "substantial adverse change in existing air quality, ground or surface water quality or quantity, traffic or noise levels . . . the impairment of the character or quality of important historical ... or aesthetic resources or of existing community or neighborhood character . . . changes in two or more elements of the environment, no one of which has a significant impact on the environment, but when considered together result in a substantial adverse impact on the environment" (6 NYCRR 617.7 [c] [i] [v] [xi]).
Then the agency must issue a declaration, either positive or negative, of environmental significance (see 6 NYCRR 617.2 [y], [ac]). This determination must be "in a written form containing a reasoned elaboration and providing reference to any supporting documentation" (6 NYCRR 617.7 [b] [4]). If a project "may have a significant effect on the environment" then the lead agency must issue a positive declaration and prepare an Environmental Impact Statement ("EIS") (Matter of Barrett v Dutchess County Legislature, 38 AD3d 651, 655 [2d Dept 2007], quoting ECL 8-0109 [2]). An EIS is required if the proposed project "may include the potential for at least one significant adverse environmental impact" (6 NYCRR 617.7 [a][1]). "Because the operative word triggering the requirement of an EIS is 'may', there is a relatively low threshold for the preparation of an EIS" (Matter of Omni Partners, L.P., v County of Nassau, 237 AD2d 440, 442 [2d Dept 1997]).
On the other hand, although an EIS is presumptively required for type I actions (see, Matter of Town of Dickinson v. County of Broome, 183 AD2d 1013, 1014 [3d Dept 1992]), it is not a per se requirement (see Matter of Save the Pine Bush v. Planning Bd. of Town of Guilderland, 217 AD2d 767 [3d Dept 1995]] lv. denied 87 NY2d 803 [1995])
However, if an agency issues a negative declaration, eliminating the need for an EIS, it can only do so after it has "identified the relevant areas of environmental concern," taken "a 'hard look' at them, and "made a 'reasoned elaboration of the basis for its determination'" (Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 417 [1986] [citations omitted]; Matter of Munash v Town Bd. of Town of East Hampton, 297 AD2d 345, 347 [2d Dept 2002]).
As with Article 78 proceedings in general, a court must limit its review to whether the agency's determination was arbitrary, capricious, an abuse of discretion, or affected by an error of law (Akpan v Koch, 75 NY2d 561, 570 [1990]).[FN1]
An agency's compliance with its substantive SEQRA obligations is governed by a rule of reason and the extent to which particular environmental factors are to be considered varies in accordance with the circumstances and nature of particular proposals (Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d, at 417, supra). Further, agencies have considerable latitude evaluating environmental effects and choosing between alternative measures (id.). While judicial review must be meaningful, the courts may not substitute their judgment for that of the agency for it is not their role to "weigh the desirability of any action or [to] choose among alternatives" (id at 416; see also Matter of Community United to Protect Theodore Roosevelt Park v City of New York, 171 AD3d 567, 568 [1st Dept 2019]).
It is not for the Court to second-guess the agency's determination even if different planners, experts or community members may have compelling disagreements, ideas, concerns or viewpoints about a proposed project (see Matter of Friends of P.S. 163, Inc. v Jewish Home Lifecare, Manhattan, 30 NY3d 416, 430 [2017]).
Here, the Parks Department issued a negative declaration. Petitioner challenges this determination. According to petitioner, the underlying analysis supporting the negative declaration was deficient and preparation of an EIS was warranted. The Parks Department issued a negative declaration after analyzing potential project impacts in the areas of land use, open space, historical and cultural resources, urban design and visual resources, natural resources, hazardous materials, water and sewer infrastructure, greenhouse gas emissions and climate change, public health, and construction. However, petitioner alleges that the Parks Department failed to take a "hard look" at impacts to three of the categories: (1) open space, (2) historic and cultural resources, and (3) natural resources. Lastly, petitioner claims that respondents infringed upon its environmental rights pursuant to the New York State Constitution's Green Amendment.
Respondents argue that they properly determined that no significant impacts were found and that the Parks analysis was rational and complied with the CEQR Technical Manual.
SEQRA does not set forth specific standards for judicial review, and so review of a lead agency's negative declaration must be guided by standards applicable to administrative [*6]proceedings generally: "whether a determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion" (CPLR 7803[3]; Matter of Gernatt Asphalt Products, Inc. v Town of Sardinia, 87 NY2d 668, 688 [1996]). The court's role is not "to weigh the desirability of any proposed actions" or "choose among alternatives," but only to insure that respondents have satisfied substantive and procedural requirements of SEQRA, CEQR and its implementing regulations (Matter of Fisher v Giuliani, 280 AD2d 13, 19-20 [1st Dept 2001]; see Roosevelt Islanders for Responsible Southtown Dev. v Roosevelt Is. Operating Corp., 291 AD2d 40, 54 [1st Dept 2001]).
THE INSTANT ENVIRONMENTAL ASSESSMENT
Parks issued its EAS for this project in June 2023 (see EAS [NYSCEF DOC 40]). As noted, it found no potentially significant adverse impacts in any category and thus issued a negative declaration.
Regarding Land Use and Zoning, the EAS concluded that:
The Proposed Project would not result in a significant adverse impact on land use, zoning, or public policy, in accordance with CEQR Technical Manual guidelines. The proposed project would improve a publicly accessible open space resource with improved drainage and erosion control, improved user safety and accessibility, improved circulation and connectivity, as well as the visual reintroduction of the Monument into the plaza area along its northwest axis. The Proposed Project would not directly displace any land uses, adversely affect surrounding land uses, or generate land uses that would be incompatible with land uses, zoning, or public policy in the study area. Therefore, no significant adverse impacts to land use, zoning and public policy are expected as a result of the Proposed Project (EAS at B-7 [NYSCEF DOC 40] ).
Regarding Open Space, the EAS again explained that each of the project elements is designed to make the Park more accessible (including ADA accessibility), address erosion and drainage, and rehabilitate features of the Park to increase connectivity and improve the overall use and enjoyment of the Park by members of the public (EAS at C-2, C-4 [NYSCEF DOC 40]). Further, it concluded that "The Proposed Project would not result in a loss of open space nor would it lead to an increase in noise, air pollutants, odors, or shadows that would have a direct effect on the Park" (Id. at C-3).
As to Historic and Cultural Resources, the EAS discussed at length the storied history of the Park, its Landmark status, its various designs and redesigns over the years, and analyzed the potential impacts of the Project. Ultimately, the EAS concluded:
Based on the Park's historical past, documentation has shown the Project Site has the potential to contain archaeological sensitive areas. Furthermore, the Park includes known historic and cultural resources including the LPC-designated Fort Greene Historic District that also listed on the State/National Register of Historic Places. As discussed above, LPC has reviewed the Proposed Project and has indicated their approval of the proposed elements of the project in a series of Commission Binding Reports (see Appendix A). To address any archaeological concerns, an "Unknown Discoveries Plan" that was reviewed and approved by LPC will be in place during excavation to address any unanticipated archaeological finds. Therefore, no significant adverse impacts to historic and cultural [*7]resources are expected to occur as a result of the proposed project (EAS at D-10 [NYSCEF DOC 40] ).
In relation to Urban Design and Visual Resources, the EAS stated:
The Proposed Project would not result in a change to the arrangement, appearance, or functionality of the built environment in a way that would adversely affect a pedestrian's experience of the area. In addition, the Proposed Project would not have the potential to obstruct any important visual resources. It would reintroduce the Prison Ship Martyrs' Monument to the plaza area. Further, as discussed in Attachment D, LPC has reviewed the Proposed Project and has indicated their approval of the proposed elements of the project in a series of Commission Binding Reports; and, to address any archaeological concerns, an "Unknown Discoveries Plan" that was reviewed and approved by LPC will be in place during excavation to address any unanticipated archaeological finds. Therefore, the Proposed Project would not result in a significant adverse impact on visual resources and no further assessment is necessary (Id.at E-8]).
The EAS also thoroughly reviewed potential impacts on natural resources, including trees. As part of the Project, Parks engaged qualified arborists to conduct an on-site survey, conducted an updated tree inventory of the Park (see Tree Inventory [NYSCEF DOC 42] ), and evaluated the natural resources in the Park using a number of state and federal natural resource databases covering, for example, bird migration, wildlife ranges, and native insects and pollinators.
As described in the EAS, the Project will involve the replacement of a total of 78 of the study area's 424 trees. Thirty planned tree removals are necessitated by the trees' condition, as observed by the Parks Department's exhaustive inspection and inventory report, and the remaining 48 trees will be removed due to conflict with the design of the proposed Project. Specifically, these trees must be removed to allow for the new entrance at the northwest corner. Notably, over 500 trees will be planted, including over 200 as part of the Project.
The EAS found that:
The Proposed Project's tree removals would be compensated for in accordance with The NYC Admin Code 56 RCNY § 5-02. The Proposed Project would not diminish the Park's size or capacity to function. Nor would it result in any of the conditions listed below.
• render a water resource unfit for one or more uses for which it is classified and/or cause or exacerbate a water quality violation;
• directly or indirectly adversely affect a significant, sensitive, or designated resource;
• diminish habitat for a resident or migratory endangered, threatened, or rare animal species or species of special concern;
• result in the loss of plant species that are endangered, threatened, rare, vulnerable or rare for the City;
• result in the loss of part or all of a resource that is important because it is large, unusual, the only one remaining in the area where the project is to take place, or occurs within a limited geographic region;
• cause a noticeable decrease in a resource's ability to serve one or more of the following [*8]functions: wildlife habitat; food chain support; physical protection (e.g., flood protection), water supply, pollution removal, recreational use, aesthetic or scenic enhancement, commercial productivity, or microclimate support; or
• contribute to a cumulative loss of habitat or function which diminishes that resource's ability to perform it.
Therefore, the Proposed Project would not result in a significant adverse impact on natural resources (EAS at F-21, 22 [NYSCEF DOC 40]).
Turning to Hazardous Materials, the EAS once again found that the Project would not result in any significant impacts to hazardous materials. However, it is notable that during the site assessment and investigation, it identified two adjacent sites ("recognized environmental conditions" or "RECs"), across the street from the Park, where hazardous materials violations had occurred. One was a petroleum spill from a church fuel tank, where the spill had since been fully cleaned up and the matter closed, and the other was a dry cleaner with unspecified violations in connection with its solvent generation (EAS at G-1, G-2 [NSYCEF DOC 40]).
A site investigation was conducted that included soil borings and sampling. The NYC Department of Environmental Protection (DEP) reviewed the findings and requested some additional actions, including: a) Developing a Remedial Action Plan (RAP) to handle any impacted soils encountered during construction; b) Providing minimum clean soil/fill depths in landscaped areas; c) Submitting a Construction Health and Safety Plan (CHASP); and d) Implementing a Community Air Monitoring Program (CAMP). These plans were developed and found acceptable by DEP as indicated in a May 31, 2022 letter (Id.at Appx C).
Because of the lack of any identified hazardous materials on site, the RAP, CHASP, and CAMP are comprehensive work plans designed to customary standards to ensure that, if any undetected hazardous material exist on site, neither workers nor the public will be exposed to them (see Ex 7, Remedial Action Plan [NSYCEF DOC 45]).
As to Water and Sewer Infrastructure, the EAS looked at the stormwater impacts of the Project. The EAS considered the green infrastructure features of the Project added in order to reduce stormwater runoff generally, including "swales, concrete drywells, retention and detention systems and direct[ion of] runoff to planted areas." (EAS at H-1 [NYSCEF DOC 40] ). In sum, the EAS remarked "the Proposed Project is not anticipated to result in significant adverse impacts to the City's water and sewer infrastructure systems and no further assessment is warranted for the Proposed Project." (Id. at H-2).
The EAS also found the Proposed Project is not inconsistent with the City's efforts to reduce Greenhouse Gas emissions and prepare for the likely consequences of Climate Change and no further assessment of Greenhouse Gas and Climate Change is warranted for the Proposed Project. Although it noted there would be construction activities as a result of the Project, it noted that these would be temporary and not expected to make an appreciable contribution to GHG emission (Id. at I-1).
As to Public Health, the EAS concluded that:
the potential for public health impacts to occur because of proposed project is typically related to unmitigated significant adverse air quality, noise or hazardous materials [*9]impacts. The Proposed Project is not expected to result in significant adverse impacts to public health resulting from air quality and noise impacts. Hazardous materials will be addressed according to NYC DEP-approved methods, in accordance with a RAP and CHASP that will be carried out as a required specification of the contract for the Proposed Project (Id.at J-2).
The EAS also fully explored the issue of Construction, finding that
With the proposed construction measures conducted in conformance to applicable City, State and federal regulations, the Proposed Project would not result in a significant adverse construction-related impacts. The construction of the proposed project is expected be less than 24 months. Hazardous materials will be addressed according to DEP-approved methods, in accordance with a RAP and CHASP that will be carried out as a required specification of the contract for the Proposed Project (see Attachment G: Hazardous Materials). The project has been reviewed by LPC and to address any archaeological concerns, an "Unknown Discoveries Plan" that was reviewed and approved by LPC will be in place during excavation to address any unanticipated archaeological finds. The Proposed Project's tree removals would be compensated for in accordance with the NYC Parks Tree Valuation Protocol and Local Law 3 of 2010 and Proposed Project is not expected to diminish the Park's size or capacity to function that would lead to impacts to Natural Resources. Finally, construction activities would be limited to the areas of proposed work to minimize site disturbances to Fort Greene Park to the greatest extent possible (EAS at K-6 [NYSCEF DOC 40]).
DISCUSSION
I. HARD LOOK
Petitioner argues that Parks failed to take a "hard look" at significant adverse impacts that may result from the Project. According to Petitioner, Parks failed to take a hard look at "open space" especially with relation to the removal of the "Bye Mounds" and during the construction phase of the Project. Petitioner also claims there was not a hard look taken with respect to "Historic and Cultural Resources" because the Project includes changes to landscape features, specifically the Mounds, removal of trees, and due to the new open entry to the Park. Petitioner also claims Parks failed to take a hard look at "Natural Resources" because of the planned removal of 78 trees. This issue is discussed at length in Section IV of this Decision.
Based upon the criteria set forth in the CEQR Technical Manual, Parks concluded that an EIS was not warranted. The Parks Department, as lead agency, is entitled to judicial deference when the record supports the conclusion that the lead agency took the requisite "hard look" at the environmental impact as required by SEQRA, and set forth a reasoned elaboration for its determination (Akpan v Koch, 75 NY2d 561, 570 [1990]; Matter of Jackson, 67 NY2d at 417)
Here, the areas of significant environmental concern were adequately identified and constituted "a policy decision[] governed by the rule of reasonableness" (Matter of Coca-Cola Bottling Co. of NY v Board of Estimate of City of NY, 72 NY2d 674, 682 [1988]). "Not every conceivable environmental impact, mitigating measure or alternative must be identified and addressed . . ." (Aldrich v Pattison, 107 AD2d 258, 266 [2d Dept 1985]).
Petitioners claim that the Project will reduce open space due to elimination of the Bye mounds and especially during the construction phase of the Project. While admittedly "construction impacts will temporarily reduce the use of the Park... the EAS explain[s] that construction phasing plans will maximize public access to the Park throughout the construction period (Humes aff ¶ 14 [NYSCEF Doc No. 35]). Furthermore, the construction itself is categorized as "short term," and is anticipated to last fewer than two years" (id.). In the long term the Project will increase both passive and active recreational space.
It is significant that in its open space assessment, Parks observes that there would not be a "loss of open space," nor any direct effects that would negatively impact park usage. Again, the Project will increase open space and accessibility. Thus, it was rational for Parks to find that the Project is not expected to result in a direct effect that would lead to a significant adverse impact to Fort Greene Park." (EAS at C-1, C-4 [NYSCEF DOC 40]).
Petitioner also alleges that the removal of the Bye mounds would "change the use" of the space so as to create a significant impact to both open space and historic and cultural resources. However, petitioner fails to indicate how the "unprogrammed events, community activities, and recreation" such as the annual Halloween dog parade petitioner describes as the primary use of the Bye mounds would be deterred by the renovation (summons and complaint, at ¶¶ 9, 106 [NYSCEF Doc No. 1]). Respondents counter that removal of the Bye mounds and replacement with a flat plaza and recreational splash feature would provide for an even greater variety of uses, especially for those unable to "climb the steep, uneven, granite sides of the mounds" (Parks Memo of Law at 14). In addition, those who currently use the Bye mounds to exercise will now have the expanded and refurnished adult fitness area (Id.).
Parks also convincingly notes that "[r]egarding the new park entrance, it will replace an existing wall and stand of invasive Norway maple trees to allow recreational users access to an area that had previously been solely planted—the new entrance itself, which is suitable for both passive and active recreation (Parks Memo of Law at 14).
Parks also took a hard look at "Historic and Cultural Resources." Indeed, their review considered "the evolution of the design of the northwest corner of Fort Greene Park, explaining in detail the significance of the multiple landscape architects who have participated in its serial redesigns stretching back two centuries" (Parks Memo at 16). The EAS found that the Project would not "alter or eliminate" the historic characteristics of the Park that make it important, and this determination is consistent with the view of the Landmarks Preservation Commission ("LPC"), which, approved the Project.
Notably, contrary to Petitioner's view, Parks and LPC both rationally found that the removal of the so-called "historic grove," would not have a deleterious effect on historic resources, but, in combination with the other restoration plans for this section of the park, "will help unify historic characteristics from different development phases in a cohesive design." (EAS at D-9 [NYSCEF DOC 40]). Nor is there anything to support the idea that the allée of trees would be destroyed as claimed by Petitioner.
Parks also notes that the 1978 Fort Greene Historic District Designation Report mentions the contributions of Olmsted & Vaux and McKim, Mead, and White to the Park, but does not mention either the mounds or A.E. Bye's design, which had been implemented less than a decade prior to the listing of the historic district (Parks Memo at 18). Further, the EAS acknowledges [*10]Petitioners' claims concerning the mounds, but agrees with LPC's expert view that they are "modern accretions which are not significant architectural features in themselves or well related to the prominent axial organization of the historic designs for this section of the park." (EAS at Appx A [NYSCEF DOC 40]). There is nothing irrational about Parks conclusion here.
Petitioner points to no viable concerns relating to "Hazardous Materials" impacts and, in any event, Parks took a hard look at hazardous materials, taking soil samples, and incorporating monitoring programs at the suggestion of DEP. Similarly, Petitioners point to no real concern relating to Water and Sewer impacts. Regardless, the EAS took a hard look at the issue. Nor did Petitioner raise a serious concern about Public Health being impacted by the Project because of the removal of a small number of trees. Yet, Parks did properly assess whether any public health concerns existed. Finally, Parks also considered the impacts from construction.
While petitioner may disagree with the respondent in methodologies, extent of the review process and ensuing conclusion, they have not convincingly shown that the respondent failed to identify the areas of environmental concern or that it did not take a hard look at them (see Matter of Friends of P.S. 163, Inc. v Jewish Home Lifecare Manhattan, 30 NY3d 416, 431 [2017] [Respondents are entitled to rely on the accepted methodology set forth in the [CEQRA] Technical Manual]). This court has read and considered petitioner's other arguments and finds them unavailing. Ultimately, petitioner has not tendered sufficient evidence contradicting the documentary evidence, which conclusively establishes that Parks did not act arbitrarily or capriciously when it determined that the Project will not result in any significant adverse environmental impacts (see Matter of Chinese Staff & Workers' Assn. v Burden, 19 NY3d 922, 924 [2012]).
II. SEGMENTATION
In the second cause of action, Petitioner alleges that the Project "does not consider the cumulative impacts from nearby projects, in violation of SEQRA, and instead improperly segments the environmental review of such projects from the Park Project's review" (Verified Petition at ¶179 [NYSCEF DOC 1]). Petitioner argues that Parks violated 6 NYCRR §617.9(b)(5)(iii)(a) and ECL §8-0109(2) by failing to consider the impacts of the Project in conjunction with the construction of an adjacent luxury apartment complex at 240 Willoughby Street.
More specifically, Petitioner suggests that Parks should have considered that the luxury apartment building will bring new residents to the neighborhood and Park, and that the location of the apartment project is "side-by-side" with the Park.
Parks agrees that SEQRA prohibits agencies from "segmentation," or "the division of the environmental review of an action such that various activities or stages are addressed . . . as though they were unrelated activities, needing individual determinations of significance." (see 6 NYCRR §617.2 [ah]).
However, Parks argues and this Court agrees that this rule applies where an agency improperly segments activities or stages of one action and does not consider them as a whole. Under no circumstances could the construction of a nearby apartment building be considered part of the Project or the "action" proposed by Parks. The cases cited by Petitioner support this conclusion.
In Westbury v. Dept. of Transp. of State of NY (75 NY2d 62, 69-70 [1989]), the State had [*11]"sought to solve one localized problem caused by two predominant factors—the design of the interchange and the inadequate capacity of its highways—and the solution for each was related to the other." Thus, the Court found that the DOT "may not avoid consideration of their combined environmental effect."
Similarly, in Buffalo v. NYSDEC (184 Misc 2d 243, 255 [Sup. Ct. Erie Cnty. 2000]), the court found that a bridge review had been improperly segmented from a plaza review because it found "there is really only one plan to relieve traffic congestion and that plan includes a new bridge and a new plaza."
As a separate matter, Parks notes that the 240 Willoughby construction was permitted under existing zoning and thus was not a SEQRA "action" at all. Regardless, it was not part of the same plan put forward by Parks; it is a private development undertaken for different purposes and not connected to the Park. Nor can it be fairly said that the construction of 240 Willoughby is at the same location as the Park. Rather, it is near the Park in a grouping of long-developed buildings.
Accordingly, this claim fails.
III. CONDITIONAL NEGATIVE DECLARATION
In the third cause of action, Petitioner contends that Parks improperly issued a conditioned negative declaration (CND). Petitioner claims this is the case because the negative declaration was "conditioned on the adoption and implementation of a Remedial Action Plan (for hazardous waste contamination), Community Air Monitoring Plan (CAMP), Construction Health and Safety Plan (CHASP) related to hazardous waste contamination and an Unknown Discoveries Plan associated with possible impacts to archeological resources" (Verified Petition at ¶188 [NYSCEF DOC 1]).
Petitioner further argues that because this was a Type I Action, there was a presumption that it may cause a significant adverse environmental impact, which Parks never overcame, and that it got around this by issuing a CND as a "façade" and to evade accountability for an inadequate environmental review.
It is true that the SEQRA regulations permit CNDs for Unlisted actions, but not for Type I actions (See 6 NYCRR § 617.2[h]; § 617.7[d]). However, a CND is a negative declaration issued to a private applicant by a lead agency, where the action as initially proposed may result in one or more significant adverse environmental impacts, but the lead agency modifies the proposed action in the CND by requiring mitigation measures to avoid the significant adverse environmental impacts that would otherwise result.
Accordingly, the declaration cannot be a CND here because it was not issued to a private applicant by a lead agency. Nor does the declaration ever claim to be a CND. Instead, the Project is being proposed by a public agency.
It is significant to note again that the negative declaration issued found that the Project lacked the potential for significant adverse impacts, and not the Project as limited by conditions set forth in the declaration.
In Merson v. McNally (90 NY2d 742, 752—53 [1997]), the Court of Appeals dealt with the "dilemma" of "how to permit an evolving process for identification of environmental concerns and initiatives to meet those concerns yet, on the other hand, to guard against an avoidance of the EIS process through private bilateral negotiations between a developer and a [*12]lead agency when a project may have potentially significant environmental impacts which need full and open consideration." Even assuming arguendo that this framework applies here — and decidedly it does not — the Court of Appeals prescribed a twofold inquiry to examine whether a negative declaration has been impermissibly conditioned: "(1) whether the project, as initially proposed, might result in the identification of one or more 'significant adverse environmental effects'; and (2) whether the proposed mitigating measures incorporated into part 3 of the EAF were 'identified and required by the lead agency' as a condition precedent to the issuance of the negative declaration" (Id.).
Here, the EAS did not find that the project as initially proposed might result in one or more significant adverse environmental effects, and thus under the Merson framework it could not be concluded that the negative declaration here was impermissibly conditioned.
Moreover, in Merson the Court of Appeals found "no inherent problem in revising or modifying project plans to address concerns raised during the environmental review, particularly concerns raised by other agencies" (90 NY2d at 753-54). The Court noted that such mitigation measures could "obviate the need for an EIS" if they "clearly negate the continued potentiality of the adverse effects of the proposed action" (Id. At 754).
Thus, there is no issue with modifications or measures that take account of the concerns of agencies, particularly where an EAS has determined that the Project does not carry the risk of any significant adverse effects.
Indeed, a negative declaration is not improperly conditioned where mitigation measures were "part and parcel of the project plans being reviewed by [the lead agency] —plans which had been revised and modified to address problems raised throughout the City's CEQR review" (see Cathedral Church of St. John the Divine v. Dormitory Authority of State of NY, 224 AD2d 95, 103 [3d Dept 1996]). This is the case here.
The EAS explained that, regarding hazardous materials, an assessment was done in June 2021 to determine the potential presence of hazardous materials that might be encountered and "no historically or other Recognized Environmental Conditions (RECs) were identified to be associated with the Project Site" (EAS at G-1 [NYSCEF DOC 40]). Then, a site investigation was done in July and August 2021, and a supplemental soil sampling plan continued through early 2022.
Based on its review of the investigation, DEP made certain comments and proposed the RAP, CHASP, and CAMP plans be incorporated into the Project (Id. at G-3). These plans were prepared and then became part and parcel of the proposed Project and, as Parks notes, are "simply routine precautions that are the subject of legal requirements that apply to the project irrespective of the environmental review" (Parks Memo of Law at p. 35). These were not mitigation measures made after final submission of the review.
Accordingly, this claim fails.
IV. TREE VALUATION PROTOCOL
In its fourth cause of action, Petitioner claims that Parks acted arbitrarily in utilizing a tree valuation tool that was different from the valuation tool it generally uses for environmental reviews. Specifically, Petitioner states that Parks generally uses the "I-Tree" tool for such projects that will remove trees, "to determine the value of both the trees themselves and the value of the tree's environmental benefits that will be lost if the Tree is removed as part of the project" [*13](Petition at ¶206 [NYSCEF DOC 1]).
Petitioner relies on the affidavit of their expert arborist Carsten W. Glaeser (NSYCEF DOC 14). Among other things, Glaeser claims that the Project will remove numerous healthy, mature Japanese Zelkova trees, London Planetrees, and Honey locust trees; that Parks removes healthy trees; that Parks incorrectly found trees in poor condition; that the Norway Maple trees should all be preserved because they are hardy and provide shade; that Parks inappropriately failed to use the iTree software in valuing the trees; that removal of trees will release stored carbon into the atmosphere; and that replacement trees will provide a fraction of the square inches of tree to be removed.
Parks provided an affidavit from Ian Crumpston, a board certified master arborist and the Director of Forestry, Brooklyn, in the New York City Department of Parks and Recreation (NYSCEF DOC 36). Crumpston explained the methodology used to value and consider the health of the trees in the study area. Crumpston notes that:
the tree study conducted for the Project was extensive, granular, and highly detailed, using exclusively expert appraisers following the New York City Tree Valuation Protocol . . . In brief, for each tree, the species was noted, and the tree was measured for its diameter at breast height ("DBH"), an industry standard method of measurement. The tree was then examined for the condition of its roots, trunk, scaffold branches, small branches or twigs, and foliage and buds. Each of these features were evaluated for defects and disease conditions, and were rated as point value depending on the presence and extent of any defects. Based on these conditions, each tree was given an overall CTLA condition score reflecting its overall health (Crumpston Aff at ¶8 [NYSCEF DOC 36]).[FN2]
Crumpston also explained that based on its condition, a Tree Protection Schedule was prepared and that the placement and site of each tree was also rated to consider growing space, inappropriate placement, tolerance of growing condition, and any conflicts with infrastructure. (Id. at ¶ 10). And, he stated that where a removal was necessary due to the project design rather than its condition Parks evaluated the total trunk area to be replaced, and the replacement cost, using a metric called Trunk Area Replacement (TAR) (Id. at ¶ 11).
In response to Glaeser, Crumpston notes that "only a small fraction of the study area's London Planetrees and Honey Locust trees will be removed. Even considering all species, the trees being removed for design purposes represent less than 10% of all trees in the study area, and—because the removed trees are disproportionately smaller in size—less than 5% of the total trunk area" (Id. at ¶ 14). Crumpston also denied that Parks removes healthy trees or incorrectly found trees to be in poor condition. Crumpston also disagreed with Glaeser's finding that certain trees were in excellent condition, and notes that Glaeser relied on site visits conducted five years earlier, thus not accounting for aging and decay (NYSCEF DOC 36 [Id.at ¶ 19).
Next, Crumpston remarked that he strongly disagreed that "Norway Maples, a non-native and aggressive tree species, should hold any special consideration for preservation in City parks" (Id.at ¶ 21). He stressed that Norway Maples are inappropriate for New York City Parks, stating:
They are a maintenance burden, they are prone to disease and fungi, and they have a short life span. Their wood is weak, and they are among the worst trees in storms, as they tend to fail more than other species. The majority of the removals planned for the underlying project are Norway Maples, and replacing these trees with more appropriate native trees that are suited to this environment is a benefit of the project—not a detriment (Id.at ¶ 22).
Crumpston also explained that "Parks does not use the iTree software for any internal purpose" and that "iTree is merely one tool of many and Parks does not rely on it to quantify tree value" (Id.at ¶ 24). He was also mystified as to Glaeser's calculations regarding the square inches of tree that will be provided by the 500 young trees to be planted. Similarly, he noted that carbon is "not immediately blown out into the atmosphere when the tree is removed," but rather "[t]he trees continue to store the carbon, which is released slowly as the trees degrade and decompose. This is the natural decomposition cycle and will also be countered by the newly planted trees" (Id.at ¶ 28).
Crumpston conceded that in the short term there is a loss of the benefit provided by trees that are removed, but stated: "in the short term, there will be no significant adverse impacts because we are replacing the wood value of the trees with new trees. In the longer term, there will not be significant adverse impacts because, instead, there should be extensive benefits from the new plantings" (Id.at ¶ 30).
While Petitioner may dislike and strongly objects to the removal of trees, Parks rationally followed established methodology in the CEQR Technical Manual in determining that no significant impacts to natural resources were likely to result from the Project.
In support of petitioner's claim that removal of trees for the Project will have a significant adverse impact on natural resources and historic and cultural resources, Glaeser, petitioner's expert arborist, claims that the 78 mature trees to be removed as part of the Project "do not require removal due to health or safety concerns, and therefore were targeted for removal only for Project design considerations" and that Parks did "not consider the fact that the immature replacement trees will not be able to provide the same services or environmental benefits for a generation or longer" (Glaeser Aff at ¶¶ 15, 19 [NYSCEF Doc No. 14]). In addition, petitioner's expert preservationist, Michael Gotkin, states that
"the most significant historic features in Fort Greene Park that will be destroyed by the planned proposal are the original large grove of trees at the entrance to the park, and also the formal allée, the tree lined park path that leads to the Fort Greene monument inside the park"
(Gotkin report at 2 [NYSCEF Doc No. 13]).
However, the affidavit of Park's arborist, Ian Cumpston, explained that the difference in tree inventory was taken into account and addressed by the Parks Department. Moreover, Parks adhered to the regulations established by The "Restitution Law" (56 RCNY § 5-02) when ultimately determining that the 48 mature trees removed for project design purposes will be replaced with over 500 trees, over 200 of which will be planted as part of the Project, and over 300 of which will be planted within Fort Greene Park (Crumpston Aff at ¶ 27 [NYSCEF DOC 36]).
In Petitioner's view, Parks should have used a different tree valuation method. However, Petitioner's disagreement with a particular analysis or method does not render Parks' determination irrational or arbitrary (see Friends of P.S. 163, Inc., 30 NY3d at 431 ["Petitioners may have preferred [the agency] to adopt a different standard, but we cannot say [the agency's] determination 'was affected by an error of law or was arbitrary and capricious or an abuse of discretion.'"]).
The use of Parks chosen methodology and tree valuation protocols has been rational and upheld in other Article 78 proceedings. In Save Our Parks v. City of New York (2006 NYLJ LEXIS 3967 [Sup. Ct. NY Cty. 2006]), the petitioners argued that tree removals (in that case, of 377 mature trees) amounted to an undisclosed significant adverse impact, that the planned restitution plantings did not eliminate that impact, and that the environmental review finding no impact was arbitrary and capricious.
The Court remarked:
Petitioners contend that the FEIS's determination, that removing mature trees on the project site would not cause significant adverse environmental impact, is arbitrary or capricious. However, the project would seek to retain mature trees wherever possible and includes a replanting program in accordance with the Parks' Department's basal area tree replacement formula, which is designed to replace the ecological value of removed trees and is the mitigation specifically identified in the CEQR Technical Manual. Although there is no doubt that a three and a half inch sapling does not provide the shade and other benefits of a forty foot mature tree, as petitioners' forestry expert contends, SEQRA does not prohibit the cutting down of mature trees. SEQRA merely requires state and local governments to promote efforts which will prevent or eliminate damage to the environment (Id. at *22).
The Court stressed that SEQRA did not present a "legal bar to cutting down trees, when that is necessary to permit a project deemed beneficial to the City, i.e. the larger community, to proceed. The trees are not owed more deference than the community as a whole" (Id. at *23).
In Greenberg v. City of New York (2007 NY Misc. LEXIS 8579 [Sup. Ct. NY Cty 2007]), the proposed Project required the removal of 15 percent of the mature trees in the northwest quadrant of Washington Square Park. However, as in Save Our Parks, and here, the Project involved the planting of new trees; for every tree that was to be removed, "one tree, if not more, will replace it" (Id at *41). In finding the negative declaration issued by Parks to be rational, the Court explained:
The Parks Department does not dispute, as the Coalition argues, that the benefits that mature trees provide (temperature cooling, UV radiation reduction, carbon storage and sequestration and air pollution removal) cannot be immediately replaced by younger, smaller trees. HN12[ SEQRA and CEQR address "significant adverse environmental impacts," 6 NYCRR 617.7(c)(1)(ii) which is defined as the "removal or destruction of large quantities of vegetation" (6 NYCRR 617.7[c][1][ii]), and here, this is not contemplated.
The law requires that government ensure a suitable balance of social, economic and environmental factors be incorporated into a renovation project of this kind, and, based [*14]on the record before the court, it cannot be said that the Parks Department's determination regarding the park's trees does not ensure a suitable balancing of these factors (Id at *42-43).
In this case, in light of the chosen tree valuation protocol, careful analysis and inventory of trees, the needs of the Park and Project and the various potential impacts removal could have, and in combination with the planned planting of hundreds of trees, it cannot be said that Parks determination is irrational or arbitrary and capricious. Critically, the EAS explained "[t]he vast majority of the canopy of Fort Greene Park will be unaffected by the Proposed Project and what is removed will be valued according to the best arboriculture knowledge and replaced with an equivalent trunk area of new trees." (EAS, at F-20 [NYCEF DOC 40]).
Petitioner continually stresses that the trees to be removed are "mature trees." Yet, what is more significant is that the new plantings will provide extensive benefits well into the future. It is not irrational to make a considered choice to remove some mature trees to ensure a more accessible Park and eventually far more benefits for future generations.
Also significant is that the new plantings would consist of well-suited horticultural varieties native to the region as opposed to the Norway Maples that will be removed. As Crumpston explained, Norway Maples are no longer used in New York City parks due to their invasive tendencies, susceptibility to disease, short life span and weak wood leading to poor resilience to storms, as well as their contribution to erosion and drainage issues (Crumpston Aff at ¶ 22 [NYSCEF DOC 36]).[FN3]

Regardless, Parks carefully considered the removal of trees and their value using its chosen protocol, and contemplated the necessary replacements that would be required as part of this Project, and analyzed the potential impacts of their removal and replacement. Thus, Parks took a hard look at this issue and provided a reasoned explanation for their determination. The Court finds any remaining complaints regarding tree removal unavailing.
V. State Historic Preservation Office
In its fifth cause of action, Petitioner claims that Parks was required to coordinate with the State Historic Preservation Office ("SHPO") in the Project's review. Petitioner states that New York State established SHPO as a state-level operation to facilitate designation and subsequent preservation of historic, archeological, and cultural resources, sites, and districts. Petitioner goes on to state that SHPO is tasked with advancing a statewide historic preservation program to connect federal and state interests with local government activities. According to Petitioner:
SHPO reflects the interests of the State in preserving cultural heritage, with a focus on cooperation with local governments to ensure historic properties are considered across all [*15]levels of planning and development. The historic review process of SHPO is meant not only to ensure historic sites are properly managed by one level of government when other levels have an interest at play, but also to encourage coordination along the way (Pet Memo of Law at 49).
As pertains to this Project, Petitioner explains that in 1983, the Fort Greene neighborhood was designated — by SHPO — as a National Historic District in the National Register of Historic Places and the district encompasses Fort Greene Park. Petitioner comments that "[w]hile it is true that the Fort Greene neighborhood is also a local historic district (in addition to being a national historic place), the local government is not best situated to advocate on behalf of state or federal interests, nor was it the entity that designated the neighborhood as a historic place on the National Register." (Pet Memo of Law at 49).
Therefore, Petitioner insists that while the LPC "has jurisdiction over work done to and within local historic districts in NYC" and was "appropriately involved" in coordinated review here, "it does not have the same roles or responsibilities as SHPO with respect to national historic districts" (Pet Memo at 49-50). In sum, Petitioner argues that the failure to include SHPO in the process was irrational, arbitrary and capricious.
The CEQR Technical Manual states that "[w]hen properties listed on . . . the State and/or National Registers . . . are involved, the final determination of eligibility and/or treatment rests with the SHPO if it is a Federal or State action, and LPC if it is a CEQR action." (Mannual at Ch. 9, § 720). Accordingly, because this was a City action, Parks involvement of LPC (and not SHPO) was rational and not arbitrary and capricious (see e.g. Save Coney Island v. City of New York, 27 Misc 3d 1221(A) at 33 [Sup. Ct. NY Cty. 2010][holding that it was rational for the City to rely on LPC's determination notwithstanding that "Petitioners insist[ed] that SHPO should have been consulted."]). Indeed, as Petitioner recognizes, LPC has jurisdiction over City designated landmarks. Because the Project is a CEQR action involving only local resources and oversight, the Parks Department properly coordinated with the LPC as the appropriate reviewing authority.
VI. GREEN AMENDMENT
A. ARGUMENTS AND HISTORY
Without question, the most novel inquiry to be made in this proceeding is that concerning the Green Amendment to New York State's Constitution. In the seventh and eighth causes of action, Petitioner alleges a violation of the Green Amendment and seeks a declaratory judgment that Parks "is violating their Constitutional rights under the Green Amendment by depriving them of clean air, clean water and a healthful environment."
More specifically, Petitioner alleges that "[t]he Department's neg dec violates the constitutionally protected, affirmative rights of the Friends' Members to 'clean air, clean water, and a healthful environment' under the Green Amendment by enabling, inter alia, the felling of 78 mature trees without accounting for their lost environmental benefits for generations, or even within the Park at all" (Petition at 233 [NYSCEF Doc 1]). Petitioner also alleges:
The Department is authorizing the removal of 78 mature trees that have substantial positive environmental impacts on air quality and mitigate adverse environmental air quality, stormwater, noise and other adverse environmental impacts from surrounding [*16]conditions. This will contribute to the generation of polluted air and an unhealthy environment in and around the Park
The Department failed to abate such harms to clean air and a healthful environment by refusing to impose necessary mitigation measures as proposed by Petitioners.
The Department took no action to mitigate harm to clean air and a healthful environment and did nothing to preserve clean air and a healthful environment, or to protect Plaintiffs' environmental rights.
As a result, the Department violated Plaintiffs' constitutionally protected rights to "clean air, clean water, and a healthful environment." (Id. at 236-39]).
The Green Amendment, which took effect on January 1, 2022, states, in its entirety, that "each person shall have a right to clean air and water, and a healthful environment" (NY Const Art I, § 19). Perhaps because it is such a recent addition to our State Constitution, or because it is so succinct, nobody can definitively state what it means. Indeed, "[s]ince New York's Environmental Rights Amendment took effect in 2022, judges and litigants alike have understandably struggled to make sense of it" (Olivia Schrager, Note, State Administrative Constitutionalism And Environmental Rights: Judicial Review And New York's Green Amendment 50 Colum. J. Envtl. L. 175, 175 [2025]).
Petitioner asserts that the Green Amendment should be considered a fundamental right, like freedom of the press or speech, and that it creates substantive environmental rights "to clean air and water, and a healthful environment" and a private right of action for each person to enforce the rights created by it (Pet Memo at p. 53). Petitioner further contends that the Green Amendment applies to Parks determination and that Parks was required to consider the fundamental rights provided in considering the Project (Id.at p. 55-59). Finally, Petitioner argues that Parks failed to consider how its declaration would infringe on Petitioner's rights to clean water, clean air, and a healthful environment (Id. at p. 59).
Parks responds that the Green Amendment "does not create a new avenue for challenging an action that is already subject to the existing body of environmental laws, implementing regulations, and caselaw developed over decades" (Parks Memo at p. 36). Parks, however, states that "[i]n rare and extraordinary situations where, for example, there has been an egregious failure to implement or enforce existing law, it might be possible to vindicate environmental rights only through a direct application of" the Green Amendment (Id.at 37). Yet, because this Project was "subject to extensive and thorough environmental review under New York's comprehensive SEQRA procedures," Parks contends that "[a]n independent challenge under the [Green Amendment] should be rejected" (Id.).
Both Petitioner and Parks appear to agree that a review of the legislative history is warranted to understand the Legislature's intent in enacting the Green Amendment. Indeed, because the plain words of the Amendment do not provide a clear standard for courts to apply, it is appropriate to consider the legislative history (see Kolb v. Holling, 285 NY 104, 112 [1941]; New York Ambassador, Inc. v. Bd. of Stds. and Appeals of City of New York, 281 AD 342, 343 [1st Dept 1954]).
To support their position that the Green Amendment does not amend or supplant SEQRA, Parks states:
Assemblymember Steve Englebright, the main sponsor of the ERA in the Legislature, addressed the impact of the ERA directly on numerous occasions. On February 8, 2021, Englebright was asked, ". . . in any way does this [amendment] affect any of the laws of New York State in the environmental area — which you look after? What does it do to those laws that are in effect today?" Englebright responded, "It doesn't change any other law . . . ." Ex. 18, N.Y.S. Assembly Hearing, dated February 8, 2021, at 34. Further in that debate, Englebright stated to an opponent of the measure, "You're asking whether or not this is an initiative that would completely reform and redirect the energy of environmental protection. It does not do that." Id. Assemblymember Jennifer Lunsford provided further clarification, stating, "[p]ublic nuisance, land use laws, negligence, we have any number of avenues for people to bring suit for exactly the kind of problems contemplated by my colleagues today. This amendment does not convey upon the citizenry any additional rights of action against any other businesses, against other people, against their neighbors." Id. at 68. Similarly, on April 30, 2019, when Assemblymember Andy Goodell sought clarification, highlighting limitations on existing avenues for suit, stating, "there's specific procedures under SEQR, for example," to which Englebright responded that, "[t]his doesn't . . . change any of that. All it does is reassure participants . . . this is a context setting initiative . . . that if you are a citizen of this State, that you have the right to know . . . that the environment is expected to be healthful for you and your loved ones." Ex. 19, N.Y.S. Assembly Hearing, dated April 30, 2021, at 33.
Parks adds that "finding a Constitutional issue in a relatively minor reconfiguration of a park with limited tree removals that will be replaced under the longstanding legally required Tree Valuation Protocol—would suggest that judicial endorsement is required for almost any project of municipal government." (Parks Memo at 41).
As Petitioner points out, the history also reveals that "[t]he legislative purpose of the bill was 'to protect public health and the environment by ensuring clean air and water.'" (Pet Memo at 52). Assemblymember Englebright, in responding to questions about the language of the Amendment, explained that "clean basically means that the environment should not be allowed to compromise the health or well-being of any citizen, and that there should be no harm, no sickness, no disease, no convulsion, no injury from simply being a citizen living in this State." He also remarked that "[h]ealthful means there will be no biological sickness or harm" (see Parks Ex. 18, N.Y.S. Assembly Hearing, dated February 8, 2021, at 33-34).
Englebright also clarified as follows:
It doesn't change any other law, but what rather it does is it offers context, guidance and instruction to the various organs of State government. I'd like to think of it as  that this Constitutional Amendment is the frame for a collage of State agencies and institutions that are all supposed to be working in the same direction to protect the health and well-being of our citizens. So I see this, basically, as the frame of context that will give a greater sense of expectation, a sharper rendering of the expectation of being a  a member of our society in New York, vis-a-vis what will it mean to you and your loved ones' health (Id. at 34).
In response to a question about whether the Amendment would "create an individual's right of private action under Constitutional purposes," Englebright stated "This does not create anything new in terms of rights of action."[FN4]

On the other hand, Petitioner notes that on the Senate side, Senator Robert Jackson explained: "New Yorkers will finally have the right to take legal action for a clean environment, because it will be in the State Constitution. And we will finally have safeguards requiring government to consider the environment and our relationship to Mother Earth in the decision-making process." (see NYS Senate hearing transcript, dated January 12, 2021 at 147).
Senator Jackson further explained that:
clean and fresh water is, in my opinion, a human right, a right for all of us in our state and in our country and our world. And obviously it's not defined in the Constitution and in this amendment, but that issue, if necessary to be defined, will be defined . . . Just like in the Campaign for Fiscal Equity, the Constitution of the State of New York said that everyone is entitled to a Sound, basic education, where the highest court in the State of New York said  equated a sound, basic education to an adequate education. And it defined that in a decision. It said, meaning the highest court in the State of New York said, that an adequate education means that every child should have the opportunity to graduate from high school knowing how to read, knowing how to write, knowing how to serve on a jury, and being able to hold competitive employment. A lawsuit had to be filed in order for the court to decide what the entitlement was for a sound, basic education. I hope that that's not the case in defining clean water and clean air. But if necessary, then that's what has to happen. (Id. at 141-42).
Significantly, the formal justification provided for the amendment in the Sponsor's Memorandum stated:
Recent water contamination and ongoing concerns about air quality have highlighted the importance of clean drinking water and air as well as the need for additional protections. Several other states including Pennsylvania, Hawaii, Massachusetts and Montana have constitutional protections in place to ensure access to clean air and water. This proposed constitutional amendment would follow those models and ensure that clean air and water are treated as fundamental rights for New Yorkers (Parks Ex 17 [NYSCEF DOC 55]).
Ultimately, "[l]egislative and public commentary was often muddled or vague (and even sometimes contradictory) on questions relating to the amendment's precise legal meaning and [*17]application" (see Katrina Fischer Kuh, Nicholas A. Robinson, Scott Fein, Note, New York's Constitutional Guarantee of Environmental Rights, 27 N.Y.U. J. Legis. & Pub. Pol'y 361, 384 [2024-25]). The authors of New York's Constitutional Guarantee of Environmental Rights note, however, that:
. . . the record reflects a widespread sentiment that the amendment explicitly articulated rights so basic and fundamental that it affirmed rights that were already understood and many persons believed (whether accurately or inaccurately) to exist. What was surprising to most was not the idea that New Yorkers possess environmental rights, but the realization that this was not (yet) formally legally recognized. . . while there was consensus that the precise contours and mechanisms of implementation of Article I, section 19 would require judicial elaboration and would come into focus over time, there was also a clear expectation that it would affect meaningful change (Id. at 384-85).
In this regard, it should be considered that:
Proponents characterized the amendment as significant and expressed the view that it would advance broad goals rectify environmental justice; improve environmental public health provide citizens with more voice and stronger levers to challenge government action and improve government decision making; tilt the scales in favor of environmental and human health over industrial interests . . . proponents of the amendment clearly understood it to be a vehicle for effecting real change, motivated by a conviction that the existing framework of environmental law in New York had serious limitations (Id. at 386-87).
Significantly, it was proponents in the Legislature, and more than 70% of voters who supported the measure when it was put on the ballot, who eventually prevailed. 
There is other relevant history and context to consider here. Just as the New York State Constitution has included an Article on Education for decades (Art IX), it has likewise included an Article on Conservation (Art XIV). In fact, both the Education and Conservation Articles were renumbered and amended in the 1938 Constitutional Convention, and approved by vote of the people on November 8, 1938.
The Conservation Article, inter alia, guarantees that forest preserve owned or acquired by the state shall "be forever kept as wild forest lands," provides for the construction and maintenance of reservoirs, proclaims that "Forest and wild life conservation are hereby declared to be policies of the state," requires the legislature to include adequate provision for the abatement of various types of pollution, and states that "[t]he policy of the state shall be to conserve and protect its natural resources." (NY State Constitution Art. XIV §1-4). However, importantly, the Conservation Article has not been treated as or held to be a self-executing right, and its implementation is reliant on subsequent legislation (see Leland v. Moran, 235 F.Supp.2d 153, 169 [N.D.NY 2002]), aff'd, 80 Fed. Appx. 133, 2003 WL 22533185 [2d Cir. 2003]; see also NY State Bar Ass'n, The Task Force on Environmental Aspects of the New York State Constitution, 38 Pace L. Rev. 182, 190-91 [2017]).
Because of the limited reach of the Conservation Article, in the lead up to the potential constitutional convention in 2017, the New York State Bar Association convened a taskforce to [*18]look at the issue. In their report, the taskforce recommends no changes be made to Article XIV, but suggested an amendment of the Constitution to include a self-executing environmental right, enforceable by citizens against the State (The Task Force on Environmental Aspects of the New York State Constitution, 38 Pace L. Rev. 188-214).
The Task Force stressed that: 
emerging environmental threats present unprecedented societal challenges. Vexing environmental problems have emerged within the scope of traditional regulation of air and water quality, such as increased recognition of connections between pollution and asthma rates, awareness of local air pollution hot spots, and the detection of widespread contamination of drinking water with a range of pollutants (such as pharmaceuticals, PFOAs and 1,4 dioxane). More importantly, however, climate change presents challenges that have no historical analog in their scope and complexity and will require a long-term, proactive, and thoughtful governmental response.
Finally, as presently interpreted, the existing Conservation Bill of Rights in Article XIV Section 4 does not function as a robust assertion of environmental right that can help New York meet these unprecedented challenges (Id. at 190).
While a Constitutional Convention was not held in 2017, State legislators first introduced bills to amend the Constitution to add an environmental right in the 2017 legislative session. The first passage of Article I, section 19 was in the 2019 legislative session and the second passage occurred in the 2021 legislative session. The proposal to amend the Constitution to adopt Article I, section 19 was put before voters in November 2021 as Ballot Proposition 2 (see New York's Constitutional Guarantee of Environmental Rights, 27 NYUJLPP at 370).
As part of its analysis, the State Bar task force also reviewed the self-executing environmental rights provided for in the state constitutions in Hawaii, Montana and Pennsylvania. The authors of New York's Constitutional Guarantee of Environmental Rights add that this was taking place as a "green amendment" advocacy movement was taking shape nationally (27 NYUJLPP at 371).
What else was happening at this time? Hurricanes Irene and Sandy in 2011 and 2012 brought severe flooding of roads and tunnels, power outages, closure of the New York City subway system, and tremendous damage to the region.
In 2021, we faced tropical storms Elsa, Fred and Henri, and then Hurricane Ida gave us widespread flooding which shut down the subway and all commuter rail lines, caused billions of dollars in damage, and caused eighteen deaths, many of those due to flooding of basement level apartments. These events were specifically considered by legislators and others supporting the proposed Green Amendment (see 27 NYUJLPP at 383-84).[FN5]

In those same years, beginning in 2017, New York legislators were concerned about the weakening of environmental protections at the federal level, and specifically articulated a desire [*19]to protect the environment in the State Constitution. In 2019, State Senator David Carlucci remarked "We need to step up, protect [the environment], and the best place to do that is in our State Constitution" (Id. at 377-78).
In addition, starting in 2015, there had also been the alarming discovery of drinking water contamination in Hoosick Falls, New York, which evoked the drinking water crisis in Flint, Michigan (Id. at 373-74). Although this major concern was dealt with by specific legislation, including setting limits on contaminants, "when the legislation to adopt Article I, section 19 was first introduced in 2017, sponsors and proponents hosted a press conference that featured residents of Hoosick Falls sharing their stories. Advocates described New York's Green Amendment as 'inspired by cases like the water crisis in Hoosick Falls'" (Id. at 376).
And, of course, we have all been impacted and in numerous ways by the COVID-19 pandemic, and concern about airborne disease, air quality and pollution became paramount. These concerns, which also intersected with those about environmental justice and systemic racism, were considered by some proponents of the Green Amendment (Id. at 379-80). 
B. WHAT DOES IT MEAN?
While there may have been conflict or different understandings put forth by individual legislators, it is well settled that constitutional provisions are "presumptively self-executing" and thus a private right of action is presumptively available (Brown v State of New York, 89 NY2d 172, 186-87 [1996]). Beyond the presumption, there is no reason this Court can identify to view the Green Amendment as anything other than self-executing. Indeed, the plain language of the Amendment is brief, unambiguous, and does not reference or rely on subsequent legislation.
In Fresh Air for the Eastside, Inc. v. State (2022 WL 18141022 [Sup Ct New York Monroe County 2022], Aff'd as Modified by Fresh Air for the Eastside, Inc. v. State, 229 AD3d 1217 [4th Dept 2024]), the Court considered a suit filed against New York State, the Department of Environmental Conservation, New York City, and a landfill operator for injunctive relief and declaratory judgment that odors and fugitive emissions from a landfill violated the Green Amendment. Plaintiff sought a declaration that the Defendants are violating Plaintiff's Members' constitutional rights under the Green Amendment to clean air and a healthful environment by causing odors and emissions into the atmosphere, and sought for the Court to order the immediate closure of the Landfill, or alternatively direct the Defendants to immediately abate the condition.
The Court, citing to an Albany Law School Government Law Center Explainer "New York's New Constitutional Environmental Bill of Rights: Impact and Implications" Is the Green Amendment Self-Executing? by Scott Fein and Tyler Otterbein, found that the Green Amendment is self-executing without further legislation, and that it created a cause of action against government actors, but not private entities (2022 WL 18141022 at *7-8). Specifically, the Court quoted the Explainer which contented:
In contrast to the constitutional provisions . . . which explicitly reference further action by the legislature, there is no mention in the text of the Green Amendment of involvement of the legislature or legislative process as a predicate to implementation. Consequently, based on the plain text, it would seem that the Green Amendment is enforceable without additional legislation . . . (Id.).
Accordingly, the Court dismissed the action as against the private landfill operator. The Court separately granted the City's motion to dismiss, finding that it had no duty in relation to this particular landfill. The Court, however, denied the State's motion to dismiss.
On appeal, the Fourth Department modified Supreme Court's order by dismissing the action against the State, and otherwise affirmed (see Fresh Air for the Eastside, Inc. v. State, 229 AD3d 1217 [4th Dept 2024]). As is pertinent here, in its memorandum decision the Fourth Department appears to agree that the Green Amendment is self-executing and provides a cause of action but found that it only "'governs the rights of citizens with respect to their government and not the rights of private individuals against private individuals'" (Id. at 1218, quoting SHAD Alliance v. Smith Haven Mall, 66 NY2d 496, 503 [1985]; see also Seneca Lake Guardian, Inc. v. Seneca Meadows, Inc., — NYS.3d &mdash, 2025 WL 1440128 [Sup Ct, Albany County 2025][following the reasoning set forth in Fresh Air that a private party cannot assert a Green Amendment claim against another private party]). Yet, it must be noted that the Fourth Department did not explicitly make any finding as to whether the Green Amendment is self-executing.[FN6]

Justice Arlene P. Bluth's analysis in Marte v City of New York (2023 NY Slip Op 31198[U] [Trial Order], at **2 [Sup Ct, NY County 2023]), is also instructive. Plaintiffs in Marte challenged the approval of a large real estate development that had issued a negative EIS and was subject to SEQRA/CEQR protocol. Notably, the development had been the subject of two previous legal challenges which were unsuccessful. 
The court rejected petitioner's Green Amendment claim on the grounds that it was time-barred but also noted that it was wary of "creat[ing] a brand-new route to challenge developments on an environmental basis" when
"SEQRA and CEQR provide substantial environmental protections and require state and city agencies to consider all manner of factors before approving certain projects. A Court is not the right forum to, essentially, modify the state's environmental regulatory scheme regarding consideration of proposals for developmentsthat is the province of the legislature" (Id. at **6). A few distinctions must be noted, however. In Marte, the Green Amendment claim was not made with the initial efforts to challenge the development, but rather was another "bite at the apple" after years had passed following unsuccessful challenges (Id. at **6). While the Court could not say how "the Green Amendment will be interpreted over time" it "decline[d] to find that it somehow creates a way to, essentially, make a motion to renew or to start raising challenges that should have been raised long ago" (Id.).
Interestingly, the Court in Marte noted some conflicting potential outcomes regarding the [*20]Green Amendment. First, it noted that "[v]arious court opinions across the country in states that have adopted these types of amendments suggest: '1) that constitutional environmental rights have been interpreted primarily as procedural, not substantive, rights, and (2) that courts ignore the substantive rights language in the constitutional text in favor of other language, which is then given its content through other legal doctrines'" (Id. at **4-5 [quoting Amber Polk, The Unfulfilled Promise of Environmental Constitutionalism, 74 Hastings LJ 123, 165 [2022]). 
On the other hand, the Marte court found that "many states, such as Pennsylvania and Hawaii, have found that this type of provision is self-executing" and that "the broad language used in New York's Green Amendment poses thorny questions about how it impacts a plaintiff's right to seek relief in reliance upon this provision" (Id. at **5). Pointing out that the Green Amendment was added to New York's Bill of Rights, the court remarked that it "will undoubtedly make it easier for parties to seek relief where, potentially, they may not have been able to previously make such application." The court further added that the Green Amendment "will undoubtedly change the standard by which such claims are analyzed. A Court must consider whether a challenged agency action brought in an Article 78 proceeding is arbitrary or capricious. That may not be the standard to evaluate a possible violation of a constitutional right under the Green Amendment" (Id.).
Ultimately, beyond the procedural issues and other grounds for dismissal in Marte, the court found that the "substantive claims in the complaint do not compel the Court to deny the instant [dismissal] motions" since unlike Fresh Air the case did not involve "odors from an existing landfill" or "evince the same sort of environmental concerns that might accompany, for example, a landfill or toxic waste site" (Id. at **7). Ultimately, the court made "no finding that concerns about air quality are unfounded" but found "that such a concern was addressed in the environmental analysis . . . and there is no basis to revisit it" (Id. at **8).
In Chan v. United States Department of Transportation (2024 WL 5199945 [SDNY 2024]), the court considered challenges to New York City's congestion pricing plan, and a request for a preliminary injunction. Among the assertions reviewed was Plaintiffs' claim of a likelihood of success on their claim that the program violated the Green Amendment.
The District Court, citing Marte and The Unfulfilled Promise of Environmental Constitutionalism, supra, noted that courts interpreting similar constitutional provisions safeguarding environmental rights interpret the amendments primarily as procedural and not substantive rights. In this same vein, the District Court cited New York courts taking a similar approach (Chan, at *37, citing People by James v. PepsiCo, Inc., 2024 WL 4685935, at *5 [NY Sup. Ct. Oct. 31, 2024]["While Plaintiff points to the Green Amendment to the State Constitution which establishes the right to clean water, clean air, and a heathy environment, Plaintiff is unable to reference any statutory obligations that Defendants have violated by producing these bottles and plastic wrappings."]; Streeter v. N.Y.C. Dep't of Env't Prot., 213 NYS3d 865, 870 [NY Sup. Ct. 2024][The Green Amendment[ ] ... "was not intended to change existing laws, such that it allow[s] this Court, in essence, to become the forum to modify the Administrative Code."]).
The court in Chan then "join[ed] in those courts' hesitance to read the Green Amendment as creating a self-executing substantive right that imposes environmental standards above and beyond the state's preexisting—and robust—environmental regulatory regime" (Id. at *38). In [*21]support of this view, the court added that "[h]ad the New York Legislature wished to supplement the state's environmental regime by creating a higher legal standard, it could have done so with far less effort and fanfare by passing a law in a single legislative session" (Id.).
The court further suggested that the Green Amendment "appears to operate more like the Education Article which guarantees only a 'sound basic education,'" (see generally Aristy-Farer v. State, 29 NY3d 501 [2017]), and specifically cited to Senator Jackson's remarks expressly comparing the amendment to the Education Article (Id. at *38, n.32).
The court then concluded:
The Green Amendment's guarantee of "clean air and water, and a healthful environment" thus should not be read to forbid every government action that in any way lessens the cleanliness of any New Yorkers air or water or makes the environment less healthful. Every infrastructure project will, by its nature, have disparate effects. Some, particularly those who live within or near the construction site, will experience environmental deterioration even if the vast majority do not. The question is not whether any New Yorker is made worse off. It is whether New York State operates a system that ensures all its citizens have a baseline level of clean air, clean water, and a healthful environment. The Court's reading does not render the Green Amendment a "nullity," as Plaintiffs in Mulgrew and Chan protest, but merely a lower standard than Plaintiffs might prefer.
* * *
The Green Amendment cannot be wielded to prevent an initiative with broad environmental benefits on the basis of a few localized harms that do not deprive those New Yorkers of access to clean air and water or a healthful environment. A rule that prevented any government act that worsened environmental outcomes for even a single New Yorker while improving those outcomes for everyone else would go far beyond the environmental scheme the New York Legislature has adopted and would essentially stymie any development project or pro-environment initiative. Absent a showing that the individuals made worse off by the Tolling Program are actually being denied the constitutional minimum of state systems to preserve a healthful environment, Plaintiffs fail to show a likelihood of success as to their Green Amendment claims. (Id. at *38, 40).
This court is similarly cautious to extend an additional basis to challenge the project beyond SEQRA and notes that none of the scant case law available authorizes replacing, amending, or supplanting the existing body of environmental law. In Marte, the court cogently stated that a Court is not the right forum to alter environmental regulations and instead that duty belongs with the legislative branch. It has also been persuasively argued that there are considerable risks to tasking "generalist judges" with deciding each and every local environmental concern via a constitutional review (see Michael Lewyn, Note, Green Amendments, Land Use, And Transportation: What Could Go Wrong? 41 PACENVLR 204, 219 [2024]["Americans should be very careful about giving judges substantial discretion to make policy decisions. Since green amendments are so vaguely worded, they do exactly that."]).
However, this court's mandate is to say what the law is (see Schieffelin v. Komfort, 212 NY 520 [1914]), including as to newly enacted constitutional amendments. The Court recognizes that it may be that no State Court, apart from perhaps the trial court in Fresh Air, has "explicitly [*22]construed the breadth of the Amendment" (See State Administrative Constitutionalism And Environmental Rights, 50 CLMJEL at 177).
The Court agrees with the trial court's holding in Fresh Air that the Green Amendment is self-executing without further legislation, and that it creates a cause of action against government actors. As laid out above, it is clear that the plain language of the Green Amendment, in contrast with the Conservation and Education Articles, provides for a self-executing right. Notably, nothing in the plain language makes the Amendment contingent on further action from the legislature. Moreover, as noted, in New York constitutional provisions are presumptively self-executing unless there is express language providing otherwise.[FN7]

Additionally, as discussed, it is also clear that the intent of the legislators and supporters of the amendment was that it would provide a constitutional guarantee to certain environmental rights, and that New Yorkers could directly enforce such rights by bringing claims in our courts. Indeed, the public debate, explicit statements of supporters, and timing and context of the Green Amendment's passage, support this conclusion. Moreover, there is no reason to view the Green Amendment as different from other self-executing New York State constitutional provisions such as freedom of speech, equal protection, or security against unreasonable searches and seizures (NY Const. art. I, §§ 8, 11, 12).
While this Court also believes environmental rights might be better protected with specific additional legislation put together by experts, which could provide specific parameters, measurements and the like, the Court of Appeals long ago held that this is of no moment. In response to concerns of lack of procedural specifics in Article 1, Section 2 regarding waiver of jury trials in this state, the Court in People v. Carroll (3 NY2d 686 [1958]) remarked:
Whatever other questions arise can be competently handled by our courts until such time as the Legislature, pursuant to its constitutional permission, assumes to act. 'The fact that a right granted by a constitutional provision may be better or further protected by supplementary legislation does not of itself prevent the provision in question from being self-executing'. (16 C.J.S. Constitutional Law s 48, p. 144 and cases there cited; see also, 11 Am.Jur., Constitutional Law, s 75, p. 692.)
(Id. at 692-93).[FN8]

Thus, it must be concluded that the Green Amendment creates a substantive right and separate cause of action.
Further, the placement of the Green Amendment in the bill of rights is meaningful. It joins other rights that we hold to be the most basic and sacred of rights. These include freedom of speech and press, freedom of religion, jury trials, habeas corpus, right of assembly, equal protection of the laws, and freedom from unreasonable searches and seizures (NY Const. art. I, §§ 2, 3, 4, 8, 9, 11, 12). Notably, the New York State Bar's Task Force recommended having environmental rights "viewed as on par with the other important rights protected in Article I" (38 PACELR 182 at n.9). In sum, the legislative history, context, and intent was to make environmental rights a fundamental right for New Yorkers (see Hernandez v. State, 173 AD3d 105, 113 [3d Dept 2019]["This expressly enumerated right — adopted as a result of the Constitutional Convention of 1938 and ratification by the electorate — is enshrined in the New York Bill of Rights, providing strong evidence that the right was regarded as fundamental"]).
C. A STANDARD OF REVIEW
The question still remains as to what standard of review courts should apply to Green Amendment claims. In State Administrative Constitutionalism And Environmental Rights, the author argues that when analyzing constitutional rights "deference to state agency action bearing on positiveand thus self-executingrights is an improper deferral to agency constitutional interpretation" (50 CLMJEL at 182). In other words, courts must take on their own independent review of Green Amendment claims. The trial court in Fresh Air also remarked "whether a governmental action was arbitrary and capricious may not be the standard for adjudicating constitutional rights . . . constitutional inquiries of governmental action are more rigorous." (see 2022 WL 18141022 at n. 6). Instead, the court suggested:
In adjudicating and applying the Green Amendment, it may be necessary to have a two prong test: First, did the government action comply with the applicable statute? Second, did the government action violate a person's constitutional 'right to clean air and water, and a healthful environment'? (Id. at n. 6).
The court in Marte appeared to agree that some heightened standard — as compared to the arbitrary and capricious standard — may be appropriate for Green Amendment claims.
Yet, the District Court in Chan, hesitant to review Green Amendment claims as imposing a higher standard above a SEQRA claims, applied a different lower standard that it compared to the Education Article which guarantees only a "sound basic education." Specifically, the court in Chan would look at whether "New York State operates a system that ensures all its citizens have a baseline level of clean air, clean water, and a healthful environment" and whether a particular act deprives "the constitutional minimum of state systems to preserve a healthful environment." (2024 WL 5199945 at *38, 40).[FN9]

As an initial consideration, this Court finds it inappropriate to view Green Amendment claims as akin to claims brought pursuant to the Education Article. The educational rights provided in the Education Article are not in our State Constitution's Bill of Rights, are not [*23]therefore inherently fundamental, and are not self-executing. Accordingly, in the view of this Court the proposed standard of review set forth in Chan is not suitable here.
Nor does it seem fitting to apply the arbitrary and capricious standard applicable to Article 78 proceedings. As the courts in Marte and Fresh Air remarked, a more demanding review is warranted for constitutional claims. Just as with the standard proposed in Chan, this standard would not recognize the full significance of the Green Amendment. Conversely, a strict scrutiny review may be overly burdensome and unwise to apply to these claims.
One helpful suggestion is that "to ensure protection of fundamental rights, courts should apply an intermediate, moderately deferential standard of review to agency factfinding that is central to constitutional claims" (50 CLMJEL 175 at 206). In this scheme, courts would not simply defer to agency findings or experts and would engage in an independent review of how the constitutional rights and interests should be weighed. So, for example "where experts provided by a state agency and its opponents present conflicting testimony," to support the action "the agency must provide a more persuasive explanation to justify why its preferred expert's approach is superior to that of its opponents" (Id.). Pursuant to this proposal, "[c]ourts should independently review whether environmental impacts are mitigated to the maximum extent practicable, employing their own constitutional interpretation to determine how the competing rights and interests should be reconciled" (Id. at 207).
A similar standard is proposed in New York's Constitutional Guarantee of Environmental Rights. Specifically, the authors state that "courts might adopt intermediate scrutiny, requiring the government to demonstrate that actions impinge on the right to clean air, water, and a healthful environment are justified by an important state interest that is substantially related and proportionate to action the government has taken." (27 NYUJLPP at 401). Yet, they go on to suggest that it may be "appealing" to utilize a contextual approach with a standard of review based on the principle of non-regression. In other words, "to ratchet up the level of applicable scrutiny depending upon whether the challenged action weakens, strengthens, or does not change the current level of environmental protection" (Id.).
This Court would propose a three-part test, borrowing from Fresh Air and the suggestions discussed above, and utilizing intermediate scrutiny as follows: First, did the government action comply with the applicable statute? Second, did the government action violate a person's constitutional 'right to clean air and water, and a healthful environment'? Third, if there is a constitutional violation, can the government show that the plan is justified by an important interest that is substantially related and proportionate to action the government has taken.
As applied here, Petitioner's Green Amendment claim fails. First, there are no nonconclusory allegations that the project implicates the right to clean water. Indeed, there are no specific allegations that relate to either drinking water, or water used for recreation or otherwise. Petitioner does, however, allege that the project, particularly the removal of trees, deprives its members of clean air and a healthful environment. Specifically, Petitioner expresses concern with air quality, and an unhealthy environment due to the removal of trees.
Applying the three-part test, it is first noted that, as discussed above, Parks has complied with its obligations under SEQRA, and thus it has complied with the applicable law.
Second, the removal of 78 trees in the context of this park and this project does not violate the right to clean air and a healthful environment. The Court makes this finding based on [*24]the persuasive explanation provided by Parks' expert — Ian Crumpston — which the Court finds superior to Petitioner's experts. As discussed at length, Crumpston outlined the methodology used to value and consider the health of the trees in the study area. He explained when trees must be removed because they are damaged or unhealthy, and how they calculate how to replace trees that are removed due to a project design.
The Court finds it critical and convincing that only a small amount of the area's trees will be removed, and that many of the trees to be removed are Norway Maples, which are inappropriate for New York City Parks, and which will be replaced with native species more suited to the environment. Further, the removal of 78 trees cannot be viewed in a vacuum and certainly not without considering the hundreds of trees which will be planted, and which will provide even greater benefits long into the future.
The Court is entirely unpersuaded that the removal of these 78 trees will immediately pump carbon into the atmosphere, especially since Crumpston explains that any carbon released over time as the removed trees decompose will be countered by the newly planted trees.
Moreover, as noted, while there may be a short-term loss of these trees, in the long term there will be significant benefits from the hundreds of new trees. In considering whether there is a potential constitutional violation, projects, like this one, which will actually enhance the park and the environment into the future, should be viewed in that framework.
Trees are removed from parks regularly due to damage or health concerns, and it is nearly impossible to imagine that the removal of a small number of trees will amount to a violation of the Green Amendment. This is quite far from the effects of a landfill or toxic waste site, or even noxious fumes that could certainly implicate the constitutional right to clean air and a healthful environment. One could also imagine a violation of the Green Amendment were an entire park demolished, paved and, a la Joni Mitchell, replaced with a parking lot. But here, the removal of a small number of trees will not make the air dirty or the environment unhealthy.
Even assuming arguendo that there is a constitutional violation, in the third part of the test, this Court would find that the project is justified by an important government interest to upgrade, modernize, and make more accessible local parks, and that the removal of the trees is substantially related and proportionate to Parks' project. As discussed in great detail above, the EAS explained the laudable goals of the project, looked at all potential environmental impacts, and explained why certain actions were required, including the removal of trees.
Therefore, even if petitioner could maintain a Green Amendment claim under these circumstances, this court would find that it did not violate petitioner's rights to clean air and healthful environment, and that even if it arguably constituted a violation, the project is justified by an important government interest.
As articulated by other Courts, construction projects and upgrades to parks, public transit, and more are "simply part of living in Manhattan" (Marte at **8). Concerns about these daily occurrences are primarily challenged and reviewed via SEQRA and other regulations. Many or most annoyances and impacts New Yorkers deal with from various City projects do not implicate a violation of the Green Amendment, particularly if impacts are temporary and there are long term benefits for the environment and for New Yorkers.
The Green Amendment is a great dream realized. It exists to challenge laws, activities, or proposed actions that pose significant threats to the environment. It serves as a backstop in the [*25]event federal laws and agencies fail to offer protections. And, it is apparent that it provides an independent cause of action that may be applicable to the government's failures to protect New Yorkers from contaminated drinking water, polluted air, pollutants, extreme weather and climate change events. Yet, it is unlikely to be successful in connection with upgrades of local parks, like the project here, particularly since such projects will have to pass SEQRA review and, where government action is intended to improve the environment.
Accordingly, this petition must be denied in all respects.
CONCLUSION
Accordingly, it is
ORDERED AND ADJUDGED, that the petition is denied and the proceeding is dismissed.
DATE 7/1/2025
ARIEL D. CHESLER, J.S.C.

Footnotes

Footnote 1: Petitioner references an inapplicable standard of review in their sixth cause of action, to wit, the substantial evidence standard which only applies to determinations made "as a result of a hearing held" (CPLR 7803[4]).

Footnote 2: Parks provided the Project Area Tree Inventory as an exhibit to their Answer; the Inventory provides detailed information on each individual tree in the area (NYSCEF DOC 42).

Footnote 3: Interestingly, the Tree of Heaven, the tree species that inspired A Tree Grows in Brooklyn, and which came to symbolize endurance and resilience, is also a non-native invasive species that, while widespread, is considered problematic today. In a similar vein to this case, what was once thought of as beneficial to the City is no longer, and it is not irrational to remove trees and replace them with what we now understand to be more appropriate, non-invasive, and more beneficial species with an eye to the future.

Footnote 4: Assemblymember Philip A. Palmesano retorted that "[t]his will certainly create a right of private action for individuals to bring  file for lawsuits as an individual person from a Constitutional perspective" and expressed concern that "you're going to create  shift more of that to the Judiciary which is going to allow the courts to have more say because they're going to have to have say because you're going to open up this system to more litigation, more private actions across the board on a Constitutional basis versus, you know, the regulatory process that we handle these projects." (Id. at 41). Other legislators also shared similar concerns about opening up more litigation due to this Amendment.

Footnote 5: The authors of New York's Constitutional Guarantee of Environmental Rights point out that deaths from extreme weather, among other things, increased concern about environmental justice and systemic racism, and ways to rectify the same, including by passage of the Green Amendment (27 NYUJLPP at 381-82).

Footnote 6: See State Administrative Constitutionalism And Environmental Rights, 50 CLMJEL 175, 177 at n 4 [discussing Fresh Air, noting the Fourth Department ruled "in favor of defendants on the narrow ground that a court may not order mandamus for discretionary decisions, and declin[ed] to independently interpret the Green Amendment or determine whether or not it is self-executing because such analysis would be purely "academic" given court's lack of authority to compel relief."]

Footnote 7: A forceful argument that the Green Amendment is self-executing is found in New York's Constitutional Guarantee of Environmental Rights. There, the authors argue that the Green Amendment "contains no reference to legislative or executive action as a predicate to implementation and, consequently, is presumptively self-executing" and further that "there is overwhelming evidence that legislators and the voting public understood, and those who supported the amendment intended, that it would go beyond existing statutory law and empower citizens directly, rather than simply inviting future legislative action" (27 NYUJLPP 361, 393).

Footnote 8: Of course, the Legislature could still pass additional legislation providing for specific protections or procedures.

Footnote 9: In State Administrative Constitutionalism And Environmental Rights (50 CLMJEL 175, 203), the author also points to Education Article jurisprudence as evidence that "New York state courts have successfully and independently defined constitutional rights" while declining to defer to or use standards proposed by state administrators.